UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PICTOMETRY INTERNATIONAL CORP., a
Delaware corporation,

        Plaintiff,

                               Civil Action No. 6:20-cv-6461

vs.

SANDHILLS AVIATION, LLC, a Nebraska
limited liability company,

        Defendant.

## COMPLAINT

Plaintiff, Pictometry International Corp. ("Pictometry"), and as for its Complaint against

defendant, Sandhills Aviation, LLC ("Sandhills"), alleges upon information and belief as follows:

### *The Parties*

1.      Pictometry is, and at all relevant times has been, a Delaware corporation that is

authorized to conduct business in the State of New York.

2.      Pictometry maintains its principal place of business at 25 Methodist Hill Drive in

the Town of Henrietta, County of Monroe, New York.

3.      At times, Pictometry does business as EagleView.

4.      Sandhills is a Nebraska limited liability company, which does and at all times

relevant has done business in the State of New York.

5.      Sandhills has individual members who comprise its corporate membership, all of

whom upon information and belief also are residents of the State of Nebraska.

6.      This lawsuit involves, among other things, the assessment and determination of the

respective rights and obligations of Pictometry and Sandhills with respect to an Air Services

1

Agreement between them, effective August 1, 2015 and as amended thereafter (the "2015 Agreement").

*__Jurisdiction and Venue__*

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332.

8.      This Court also has personal jurisdiction over Sandhills, and jurisdiction over this action, pursuant to Section 14(e) of the 2015 Agreement.

9.      Section 14(e) of the 2015 Agreement states, in pertinent part, that Sandhills and Pictometry:

> irrevocably: (i) submit, in any legal proceeding relating to this Agreement, to the exclusive jurisdiction of any state or United States court of competent jurisdiction sitting in the State of New York, Monroe County, and agree to suit being brought in any such court[.]

10.     Venue in this Court is proper, pursuant to the provisions of 28 U.S.C. § 1391(b)(3).

11.     Venue in this Court also is proper because the Parties agreed to the exclusive jurisdiction and venue of this Court in Section 14(e) of the 2015 Agreement, as set forth in greater detail in paragraph 9, above.

12.     Any and all conditions precedent to bringing this action have been either satisfied or waived.

*__The Critical Importance to Pictometry of Sandhills' Performance__*

13.     At all times material, Pictometry has been, and is, in the business of capturing high resolution aerial overhead imagery of real property, land features, local topography, and other objects that allows Pictometry's customers, among other things, to have historical and current 360 degree views of georeferenced images, and measure and extract other data from those aerial images.

2

4845-5609-8239.9

14. Pictometry captures those aerial images by flying aircraft specially equipped with its patented proprietary imaging systems.

15. The "capture season" during which commercially viable aerial images may be captured is limited and spans only certain specific months of the year, typically from October to May, when foliage is not present or minimal.

16. For this reason, maintaining and providing for the uninterrupted use of a fleet of specially equipped aircraft used to capture the aerial images, particularly during the capture season, is critical to Pictometry's business.

17. Toward that purpose, on August 1, 2015, Pictometry entered into the subject Air Services Agreement with Sandhills, pursuant to which Sandhills would provide maintenance and operational air support services, and pilots to fly the specially equipped aircraft, for certain planes in the Pictometry fleet.

18. The Air Services Agreement subsequently was amended three times: on June 1, 2016, July 23, 2018, and July 17, 2019.

19. True and correct copies of the Air Services Agreement and amendments thereto (collectively, and as defined above, the "2015 Agreement") are attached as **Exhibit A**.

20. The 2015 Agreement included various provisions that required Sandhills to provide the maintenance and operating services at a level that permitted largely uninterrupted availability and use of the aircraft.

21. Uninterrupted availability and use of the aircraft was an essential and material purpose of the 2015 Agreement, and was critically necessary to avoid injury to Pictometry's business and ensure safe and effective flight operations.

22. In particular, Section 2(a) of the 2015 Agreement required:

3

[Sandhills] shall provide piloted Aircraft[1] for Pictometry Services seven (7) days per week.  Each Aircraft shall be available twelve (12) hours per day with a qualified pilot available eight (8) hours per day, for each Aircraft.  As requested by Pictometry, flight times shall be conducted within the image capture window.  The image capture window . . . is considered to be 2 hours after sunrise to 2 hours before sunset[.]

23.    In Section 2(a), Sandhills further expressly recognized and agreed to the critical nature and essential purpose of its performance obligations, so as to ensure that the aircraft were consistently available on an uninterrupted basis for Pictometry's use:

> ***[Sandhills] acknowledges that Pictometry's ability to timely provide Pictometry Product to its own customers is a material element of the performance of Pictometry Services pursuant to this Agreement***, and that [Sandhills'] obligations under this Paragraph are intended to ensure that [Sandhills] maintains the availability of Aircraft for performance of Pictometry Services throughout the Term. (Emphasis supplied).

24.    In addition, the 2015 Agreement included the following particular requirements:

a.    [Sandhills] shall provide to Pictometry the services of the aircraft specified . . . Each Aircraft shall be provided as a fully-managed, maintained, airworthy, licensed under applicable law, operational aircraft, with qualified pilots suitable for use as a piloted airborne platform to perform the Pictometry Services within the continental United States as needed by Pictometry. *See* Exhibit A, Section 1(a).

b.    [Sandhills] shall operate the Aircraft in accordance with all applicable federal and state laws and other regulations, including without limitation the Federal Aviation Administration ("FAA") rules and regulations[.] *See* Exhibit A, Section 1(f).

c.    [Sandhills] agrees to devote [Sandhill's] best efforts, skills and business time and attention as needed to properly provide the Pictometry Services hereunder. *See* Exhibit A, Section 1(g).

d.    During the Operating Period each Aircraft shall be available and flight-ready for Pictometry's use no less than ninety percent (90%) of hours of availability specified in Paragraph 2[.] *See* Exhibit A, Section 9(a).

e.    Aircraft will be initially deployed pursuant to this Agreement from December 15, 2015 through May 15, 2016 and thereafter shall be deployed from each subsequent October 15 through May 15 throughout the Term, each such period of deployment constituting an 'Operating Period'. *See* Exhibit A, Section 2(c).

---

[1]    Capitalized terms used in this Complaint, unless otherwise defined herein, shall have the meanings ascribed to them in the 2015 Agreement.

4

4845-5609-8239.9

*__Sandhills' Failure to Perform__*

25. Despite the critical importance of Sandhills' compliance with these express requirements under the 2015 Agreement, Sandhills has breached its contractual obligations, and consistently exhibited a systemic inability to properly, timely, and safely maintain, operate, manage, and provide airworthy aircraft.

26. These systemic failures constitute a breach of the 2015 Agreement, and reflect a fundamental inability on the part of Sandhills to satisfy the essential purpose and the material elements of its obligations owed to Pictometry under the 2015 Agreement.

27. These systemic failures on the part of Sandhills have, among other things, forced Pictometry to incur significant cost in an effort to assist Sandhills in rectifying its failures and improving its dismal performance.

28. For example, after experiencing aircraft problems originating from Sandhills' Wahoo, Nebraska maintenance facility, which problems included mis-wired camera installation kits, expired Emergency Locator Transmitter batteries, and improper logbook entries, Pictometry was required to deploy its own FAA Inspection Authority ("IA") personnel to the Wahoo site between January 20 and May 1, 2020, to review and seek to properly address the maintenance deficiencies.

29. Pictometry's intervention was mandated, as several aspects of Sandhills' maintenance deficiencies created serious safety risks; among these were the mis-wired camera installation kits, which created a potential fire hazard on the aircraft, and the expired Emergency Locator Transmitter batteries, which presented a risk that lives would be lost in the event of an aircraft malfunction that required an emergency landing in a remote area.

4845-5609-8239.9

30.     Pictometry's deployment of its IA personnel cost Pictometry no less than $12,500, which are damages incurred by Pictometry solely by reason of Sandhills' material defaults in performance.

31.     Further, while at Sandhills' Wahoo maintenance facility, the Pictometry IA personnel observed additional serious safety concerns. These concerns included severely disorganized equipment, ineffective deployment of maintenance personnel, and substantial FAA compliance failures, all contributing to conditions making it virtually impossible for mechanics to work in the sort of focused environment that was necessary to properly maintain the aircraft subject to the 2015 Agreement, and to avoid errors that created life-threatening risks in the operation of such aircraft.

32.     These additional serious, material deficits in Sandhills' performance included:

a.  the absence of current aircraft records and data, manuals, airworthiness directives, and service information, all of which are FAA-required;

b.  the absence of proper tool supply and control programs, including the absence of necessary calibrated tools and equipment such as torque wrenches, precision measure tools, and scales used to calculate aircraft weight and balance;

c.  tools which Sandhills did have, such as air hoses and extension cords, were regularly scattered across the Wahoo facility floor, creating trip hazards and other dangerous conditions and interfering with orderly work on site;

d.  fire extinguishers were not properly hung on the walls, were otherwise inaccessible, and on occasion blocked access points, which posed risks both to personnel and to aircraft within the Wahoo facility;

e.  fire and/or emergency exits and walkways were not clearly marked;

f.  Sandhills personnel failed to use required personal protection equipment, and were not directed properly by Sandhills administration to do so;

g.  Sandhills failed to conduct regular morning safety meetings, which is an industry standard;

6

h. aircraft fuel was improperly stored in open five (5) gallon buckets overnight and for extended periods of time, with some stored in open containers in close proximity to open flame heaters and energized extension cords, raising the risk of explosion and fire; and

i. the absence of defined protocols and procedures for properly de-fueling aircraft, and grounding aircraft during the process.

33. Sandhills' failures resulted in many other instances when covered aircraft were unavailable for use as required by the terms of the 2015 Agreement.

34. As stated above, Section 9(a) required that the Pictometry aircraft be available and flight-ready at least ninety percent (90%) of the relevant time.

35. For extended periods during the 2018 and 2019 Operating Periods, Sandhills failed to meet this material performance metric.

36. For example, during these 2018 and 2019 Operating Periods:

a. Not a single aircraft of the thirteen (13) aircraft covered by the 2015 Agreement met the performance metric for every month;

b. During the months between November and April of these two (2) Operating Periods (twelve (12) months total), which are crucial times for aerial image capture due to reduced foliage coverage, no fewer than five (5) of the thirteen (13) aircraft (tail numbers N54109, N6062Y, N705SF, N739CN and N95TK) failed to meet the minimum performance metric for six (6) or more of the twelve (12) total months;

c. one (1) aircraft failed to meet the minimum performance metric for seven (7) of the twelve (12) months – *i.e.*, over half of the months in the two (2) Operating Periods;

d. On a monthly basis, there were eight (8) total months when four (4) or more of the thirteen (13) Pictometry aircraft governed by the 2015 Agreement did not meet the minimum performance metric – this was almost one third of the fleet governed by the 2015 Agreement; and

e. three (3) aircraft governed by the 2015 Agreement (tail numbers N6062Y, N680K, and N95TK) were available *zero* percent (0%) of the time for an entire month, tail number N6062Y was available during another month only seven percent (7%) of the time, and another aircraft (tail number N739CN) was available only thirty six percent (36%) of the time in the relevant one (1) month period.

7

37.     The chart below summarizes and identifies all instances when Sandhills failed to provide airworthy and available aircraft as required by the terms of the 2015 Agreement, with the highlighted boxes identifying months when aircraft were not available for the minimum required 90% of the time, and the greyed-out boxes identifying 0% availability:

| UMx + Plane-No-Pilot | | | | | | | | | | | | | |
| Date (month) | C | C | A | C | A | C | C | C | A | A | C | C | A |
| | N1694E | N3300E | N54109 | N5484D | N6062Y | N62531 | N6449J | N64CA | N680K | N705SF | N738EF | N739CN | N95TK |
| 11/1/2018 | 99% | 96% | 100% | 79% | 0% | 84% | 100% | 100% | 0% | 53% | 100% | 93% | 56% |
| 12/1/2018 | 100% | 82% | 100% | 100% | 48% | 100% | 100% | 87% | 100% | 91% | 62% | 51% | 86% |
| 1/1/2019 | 100% | 99% | 82% | 83% | 7% | 100% | 80% | 97% | 70% | 53% | 100% | 69% | 100% |
| 2/1/2019 | 97% | 100% | 89% | 96% | 83% | 100% | 89% | 100% | 83% | 100% | 95% | 97% | 92% |
| 3/1/2019 | 93% | 100% | 61% | 100% | 62% | 100% | 74% | 95% | 100% | 81% | 70% | 99% | 97% |
| 4/1/2019 | 97% | 100% | 98% | 78% | 75% | 100% | 77% | 100% | 47% | 87% | 100% | 100% | 77% |
| 5/1/2019 | 97% | 100% | 100% | 94% | 73% | 100% | 100% | 100% | 72% | 100% | 100% | 93% | 100% |
| 6/1/2019 | 100% | 0% | 100% | 0% | 83% | 93% | 100% | 100% | 0% | 0% | 100% | 100% | 100% |
| 7/1/2019 | 100% | 100% | 74% | 0% | 84% | 100% | 100% | 100% | 0% | 48% | 97% | 98% | 96% |
| 8/1/2019 | 0% | 100% | 34% | 0% | 8% | 0% | 0% | 100% | 0% | 72% | 100% | 0% | 93% |
| 9/1/2019 | 0% | 100% | 82% | 100% | 0% | 66% | 100% | 69% | 52% | 51% | 100% | 0% | 66% |
| 10/1/2019 | 0% | 99% | 100% | 100% | 0% | 90% | 79% | 0% | 84% | 94% | 100% | 100% | 21% |
| 11/1/2019 | 100% | 100% | 100% | 91% | 100% | 100% | 98% | 100% | 100% | 83% | 100% | 89% | 0% |
| 12/1/2019 | 100% | 97% | 78% | 67% | 90% | 67% | 85% | 93% | 94% | 80% | 99% | 83% | 99% |
| 1/1/2020 | 100% | 87% | 59% | 97% | 96% | 80% | 100% | 100% | 100% | 99% | 51% | 36% | 66% |
| 2/1/2020 | 100% | 99% | 86% | 100% | 97% | 87% | 93% | 100% | 100% | 91% | 94% | 93% | 82% |
| 3/1/2020 | 87% | 100% | 95% | 100% | 95% | 100% | 97% | 100% | 100% | 90% | 100% | 93% | 100% |
| 4/1/2020 | 94% | 100% | 83% | 100% | 99% | 100% | 100% | 100% | 93% | 90% | 100% | 80% | 99% |

38.     As shown in the chart included in paragraph 37, above, Sandhills failed to comply with the 90% performance requirement for 13 aircraft from November 2018 to April 2020 for a cumulative of 104 plane months when an aircraft did not meet the required performance metric, and 105 total days when these aircraft were out of service.

39.     Sandhills' failure to comply with this material performance metric had costly impacts to Pictometry's operations. When the aircraft were not available, Pictometry either could not perform in the manner required to meet client commitments, thereby losing substantial revenue, or it was forced to relocate another aircraft to the area and by doing so, lost the revenue the other aircraft would have earned while active in the area from which it was transferred.

40.     As a result of Sandhills' breach of the material minimum availability terms of the 2015 Agreement, Pictometry suffered additional damage in lost revenue, in an amount to be determine at trial but in all events in excess of $75,000.

8

41.     Sandhills' breaches in this regard also required Pictometry personnel to dedicate significant time, effort and expense to rearrange flight schedules and fleet locations, as well as to reschedule and communicate with clients and vendors regarding other scheduled capture operations that were being impacted by the aircraft being down.

42.     Pictometry also seeks recovery of these added costs, in an amount to be determined at trial.

43.     Pictometry is entitled to pursue all of its damages and other appropriate relief, and Section 10 of the 2015 Agreement in this regard specifically provides that following default and termination, Pictometry is entitled to pursue all appropriate remedies at equity or law.

44.     Moreover, provisions of the 2015 Agreement entitling Pictometry to certain credits if Sandhills failed to meet applicable performance metrics are not designated as a sole or exclusive remedy in the event of Sandhills' breach, nor designated as liquidated damages or in any other manner that would support an assertion that such credits are Pictometry's sole or limited entitlement to relief.

### *The 2018 Air Services Agreement*

45.     Pictometry and Sandhills entered into another Air Services Agreement dated October 19, 2018, as amended (the "2018 Agreement"), which provided for similar maintenance and operating services for other aircraft in the Pictometry fleet.

46.     While Sandhills also is in breach of the 2018 Agreement for myriad performance deficiencies and failures similar to those described in this Complaint, the cure period provided for in that Agreement has not yet expired.

47.     Pictometry anticipates that when the cure period does expire, a cure is unlikely to be effected by Sandhills, as its performance under the 2018 Agreement has suffered from the same

9

wholesale lack of organization, haphazard procedures, deficient administration, inadequate oversight and non-compliant conduct as has plagued the Sandhills performance under the 2015 Agreement.

48.    Sandhills' deficiencies under the 2018 Agreement include failing to meet performance metrics established under the 2018 Agreement; outsourcing its maintenance obligations to subcontractors who performed faulty work that required re-repairs; a full 100 days of lost flight availability for a *single* Pictometry aircraft (tail number N6715A); releasing another aircraft (tail number N6944A) with a heater fuel regulator shutoff valve that was long overdue for replacement and raised a severe safety issue; knowingly flying another aircraft (tail number N54826) with a substantial fire hazard condition; and requiring Pictometry IA personnel to again go to the Sandhills Wahoo facility, where they discovered conditions that compelled Pictometry to:

    a.   direct Sandhills to ground and remove from service twelve (12) Pictometry aircraft, to perform comprehensive safety inspections over a five (5) day period;

    b.   deploy its own Airframe & Powerplant mechanics to the Sandhills-affiliate Launchpad Aviation maintenance shop due to materially inflated billing and poor quality work there;

    c.   delay the return to service of two aircraft (tail numbers 2JT and 776A) for additional unmet maintenance needs due to serious deficiencies at the Launchpad Aviation location;

    d.   direct the transfer of another aircraft that was to be added to the 2018 Agreement fleet (tail number 52WW) to another vendor for maintenance and operation;

    e.   delay the planned maintenance downtime for aircraft due to Sandhills' deficiencies; and

    f.   seek to remedy other problematic conditions caused by Sandhills' substandard maintenance processes and noncompliant record keeping.

4845-5609-8239.9

49.     These manifold deficiencies and breaches of the 2018 Agreement by Sandhills have resulted in substantial additional damages to Pictometry, in an amount Pictometry will ultimately seek to have determined by the factfinder.

*__Sandhills' Financial Problems and Ownership Disputes__*

50.     Sandhills' financial condition has been deteriorating for extended periods during its relationship with Pictometry, such that in order to attempt to allow Sandhills' maintenance operations to continue without delay, Pictometry has had to provide financial assistance above and beyond its obligations under the 2015 Agreement.

51.     This supplemental support included Pictometry's direct payments to Sandhills' suppliers in order to obtain necessary parts without delay, and deferring significant payments due to Pictometry by Sandhills for overcharges.

52.     As part of these efforts, Pictometry agreed, by letter agreement dated January 14, 2020 (the "2020 Letter Agreement"), to defer Sandhills' obligation to repay approximately $250,000 owed to Pictometry for aircraft maintenance overbillings and insurance claims, provided Sandhills complied with certain conditions set forth in the Letter Agreement.

53.     A true and correct copy of the 2020 Letter Agreement is attached hereto as **Exhibit B**.

54.     The 2020 Letter Agreement conditioned Sandhills' right to deferral upon its commitment to "[e]xecute the services with the number of PODs Sandhills is currently operating."

55.     Sandhills failed to satisfy this condition of the 2020 Letter Agreement.

56.     Pictometry therefore stopped deferring this repayment, and instead offset the remaining amount owed by Sandhills to Pictometry of $222,136.27 (calculated as $110,136.27

11

owed for the repairs to aircraft tail number N1SY, plus two remaining $56,000 monthly payments) as a credit against Sandhills' Invoices 236 Rev 1 and 235, which totaled $214,574.46.

57.     This left a balance of $7,561.81 still owed by Sandhills to Pictometry, which amount Pictometry subsequently offset against Sandhills' May 2020 maintenance invoice.

58.     Pictometry has paid, or offset with credits resulting from prior advance payments to Sandhills, all amounts allegedly owed to Sandhills under the 2015 Agreement.

59.     Pictometry understands that the controlling individual member of Sandhills, Mr. Steven Sherwood, and Sandhills itself, are involved in a dispute with members of the Bentley family, arising from a purchase agreement whereby Mr. Sherwood bought out the Bentleys' prior fifty percent (50%) membership interest in Sandhills (the "Bentley Purchase Agreement").

60.     Pictometry further understands that the Bentley Purchase Agreement included provisions requiring that the Bentleys' separate aircraft maintenance facilities, as opposed to Sandhills' maintenance facilities, would have a priority right to maintain the Pictometry aircraft that are the subject of the 2015 Agreement and the 2018 Agreement, and that disputes have arisen between the Bentleys and Sandhills regarding these duties and related payment obligations.

61.     These ongoing disputes with the Bentleys have adversely impacted Sandhills' performance under the 2015 Agreement, causing further damage to Pictometry.

62.     For example, during mid-April 2020, the Bentleys unilaterally withheld from availability five (5) aircraft covered by the 2015 Agreement, which Sandhills had placed with the Bentleys for maintenance needs.

63.     This wrongful removal of these five (5) planes from service caused Pictometry to suffer additional damages of not less than $240,625.

4845-5609-8239.9

*Sandhills' Breach of its Confidentiality Obligations*

64.    Section 6 of the 2015 Agreement expressly limits Sandhills' disclosure of Pictometry's confidential information to those who specifically need access in order to perform maintenance services and obligations under the 2015 Agreement.

65.    Sandhills has ignored and violated this express restriction.

66.    Pursuant to Article 4.2(d)(iii) of the Bentley Purchase Agreement, Mr. Sherwood agreed that Sandhills would "include [the Bentleys] in any and all discussions with Pictometry and provide [the Bentleys] with all communications with Pictometry regarding terminating, modifying and amending Old Agreements."

67.    As a result, Sandhills has wrongfully disclosed to the Bentleys far more Pictometry confidential information than the Bentleys had any need to know in order to service the subject aircraft.

*Breach Notice and Sandhills' Failure to Cure*

68.    Pursuant to Section 10 of the 2015 Agreement, on May 29, 2020 Pictometry provided Sandhills with written notice of the above defaults, and provided Sandhills with ten (10) business days to cure the defaults, failing which Pictometry asserted the right to terminate the agreement and seek all available remedies.

69.    A true and correct copy of the May 29, 2020 notice letter is attached hereto as **Exhibit C**.

70.    On June 4, 2020, Sandhills, through counsel, responded to the May 29, 2020 default notice, and denied any default.

71.    A true and correct copy of the June 4, 2020 response letter is attached hereto as **Exhibit D**.

13

72.    Sandhills has failed and refused to cure the defaults identified in the May 29, 2020 default notice.

73.    On or about July 6, 2020, pursuant to Section 10 of the 2015 Agreement, Pictometry provided Sandhills with written notice of termination of the 2015 Agreement.

74.    A true and correct copy of the July 6, 2020 termination letter is attached hereto as **Exhibit E**.

75.    Also on May 29, 2020, Pictometry provided Sandhills with alternative notice of Pictometry's non-renewal of the 2015 Agreement with regard to the eight (8) Cessna aircraft identified on Schedule A of Amendment 3 to the 2015 Agreement, effective September 15, 2020.

76.    A true and correct copy of the non-renewal notice is attached hereto as **Exhibit F**.

77.    Sandhills has failed to confirm Pictometry's right to non-renew related to the Cessna aircraft, and on information and belief, Pictometry believes that Sandhills may contend that the 2015 Agreement will not terminate on September 15, 2020 as to the Cessna aircraft.

## FIRST CLAIM FOR RELIEF—DECLARATORY JUDGMENT

78.    Pictometry repeats and realleges paragraphs 1-77, above, as if set forth at length.

79.    A real and justiciable controversy exists between Pictometry and Sandhills, because Pictometry contends that Sandhills has defaulted under the 2015 Agreement, and that Sandhills has failed to timely to cure such default, while Sandhills for its part denies that it is in default.

80.    This real and justiciable controversy includes matters with a value well in excess of $75,000, exclusive of interest and costs.

81.    Pictometry therefore seeks declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and parallel provisions of the New York Civil Practice Law and Rules (CPLR 3001, *et seq.*), including a declaration that Sandhills has defaulted under the 2015

14

Agreement, and that because Sandhills has failed to timely to cure such default, Pictometry is entitled to lawfully terminate the 2015 Agreement, and pursue without limitation all available remedies at law or in equity.

82.     Pictometry also contends, in the alternative, that it has the right not to renew the 2015 Agreement with regard to the eight (8) Cessna aircraft, which Sandhills upon information and belief also disputes.

83.     Thus, as to this non-renewal issue as well there exists a *bona fide*, real and justiciable controversy.

84.     Pictometry therefore seeks a further declaration that it has the right not to renew the 2015 Agreement with regard to the eight (8) Cessna aircraft specified in this Complaint.

85.     These requested declarations will deal with a present, ascertained, or ascertainable state of facts, or present controversy as to a state of facts.

86.     This Court's interpretation of the 2015 Agreement will determine the rights and obligations of the parties.

87.     Therefore, a power, privilege, immunity, or right of Pictometry is dependent on the facts or the law applicable to the facts.

88.     The antagonistic and adverse interests are all before the Court by proper process because all of the interested parties are the named parties to this lawsuit.

89.     Declaratory judgment will resolve the parties' disagreement and either allow or disallow Pictometry's termination of the 2015 Agreement in its entirety, or alternatively as to the eight (8) Cessna aircraft, and therefore would not be merely giving legal advice.

### SECOND CLAIM FOR RELIEF—BREACH OF CONTRACT

90.     Pictometry repeats and realleges paragraphs 1-77, above, as if set forth at length.

4845-5609-8239.9

91.    Sandhills has, as a result of the above-described actions and omissions, breached the 2015 Agreement.

92.    Pictometry has suffered damages in an amount to be set by the factfinder, but well in excess of $75,000, by reason of Sandhills' breaches of the 2015 Agreement.

93.    Pictometry is entitled to recover such damages from Sandhills, together with such other and additional relief as deemed appropriate after trial of the issues.

WHEREFORE, plaintiff Pictometry International Corp., demands judgment in its favor and against defendant Sandhills Aviation, LLC, for:

(1) A declaration declaring that Sandhills is in default of its obligations under the 2015 Agreement, that Pictometry is therefore entitled to terminate the agreement in its entirety, and that Pictometry is entitled to recover its damages as a result of Sandhills' breaches;

(2) A declaration alternatively declaring that Pictometry is entitled not to renew the 2015 Agreement with regard to the eight (8) Cessna aircraft specified herein, effective September 15, 2020;

(3) The monetary damages Pictometry has suffered as a result of the breaches of contract by Sandhills;

(4) Appropriate interest as a result of the damages Pictometry has incurred;

(5) The costs Pictometry has incurred in bringing this action; and

(6) Such other, further and additional relief as this Court deems necessary and appropriate.

Dated: July 6, 2020                    WARD GREENBERG HELLER & REIDY LLP

    s/Thomas S. D'Antonio
Thomas S. D'Antonio
Amanda B. Burns
1800 Bausch & Lomb Place

16

4845-5609-8239.9

Rochester, NY 14604
Telephone: 585-454-0700
Facsimile: 585-231-1902
Primary E-mail:
tdantonio@wardgreenberg.com
aburns@wardgreenberg.com

-and-

FOLEY & LARDNER LLP

John A. Tucker
Jonathan A. Stimler
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
Telephone:  904-359-2000
Facsimile:  904-359-8700
Primary E-mail:
jtucker@foley.com
jstimler@foley.com
Secondary E-mail:
avwilliams@foley.com
(*Pending pro hac vice admission*)

*Attorneys for plaintiff Pictometry International Corp.*

17

4845-5609-8239.9

# EXHIBIT A

AIR SERVICES AGREEMENT

This AIR SERVICES AGREEMENT (this "Agreement") effective as of August 1, 2015 (the "Effective Date") by and between PICTOMETRY INTERNATIONAL CORP., a Delaware corporation with an address at 100 Town Centre Drive, Rochester, New York 14623 ("Pictometry") and Sandhills Aviation, LLC, a Nebraska limited liability company with an address at 6800 Whitewater Lane, Lincoln, NE 68521 ("Vendor") (each, a "Party" and, collectively, the "Parties").

WHEREAS, Pictometry is in the business of providing products and services based upon geo-referenced aerial imaging and simultaneous geo-positioning data for federal, provincial, local, and other authorities and other third parties (the "Pictometry Product");

WHEREAS, Pictometry has developed proprietary technology and equipment (collectively, the "Pictometry Technology") that Pictometry uses to produce the Pictometry Product;

WHEREAS, Pictometry requires the services of piloted airborne platforms utilizing the Pictometry Technology to capture geo-referenced aerial imaging with simultaneous geo-positioning data and the performance of other related services (the "Pictometry Services") in order to provide Pictometry Product to its customers, which Pictometry Services must be completed within specified time periods;

WHEREAS, Vendor is in the business of owning, operating, maintaining and providing use of aircraft as piloted airborne platforms for purposes of imagery capture; and

WHEREAS, Vendor desires to provide Pictometry with the Pictometry Services as provided in this Agreement.

NOW, THEREFORE, in exchange for the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Services Provided

    a.   During the Term (as hereinafter defined), Vendor shall provide to Pictometry the services of the aircraft specified on Schedule A to this Agreement (each, an "Aircraft"). All Aircraft specified on Schedule A are identified as being of a particular type. All Aircraft identified on Schedule A as the being of the same type are collectively referred to as a "Type Fleet". Each Aircraft shall be provided as a fully-managed, maintained, airworthy, licensed under applicable law, operational aircraft with qualified pilots suitable for use as a piloted airborne platform to perform the Pictometry Services within the continental United States as needed by Pictometry. Specifications for modifications to each Aircraft required to facilitate use of the Aircraft in performing the Pictometry Services are identified on Schedule B to this Agreement.

    b.   During the Term, Vendor shall, as requested by Pictometry from time to time and with reasonable care, receive, unpack, re-pack and ship flight system equipment and Pictometry Technology used by Vendor in connection with performance by Vendor of the Pictometry Services. Pictometry shall be responsible for the payment of all shipping costs (including any shipping insurance requested by Pictometry, and any required import/export documentation fees and duties) for Pictometry's equipment and Pictometry Technology components, including storage media used for captured data storage.

    c.   Pictometry shall be permitted access to Aircraft for the purpose of installation and removal of Pictometry Technology for twenty-one (21) days prior to and twenty-one (21) days after the Operating Period (as hereinafter defined). Unless otherwise agreed by Vendor, all Pictometry Technology must be removed from Aircraft within such 21-day period following the Operating Period. During these installation and removal periods, Vendor shall not be liable for loss or damage to Pictometry Technology (except to the extent due to the gross negligence or willful misconduct of Vendor). Vendor shall, however, take all reasonable measures to protect Pictometry Technology from such loss or damage.

    d.   Vendor shall permit Pictometry personnel to be present on Aircraft prior, during and after scheduled flights on which Vendor performs the Pictometry Services, at such times as may be required by Pictometry in its

Page 1 of 9

sole discretion. Pictometry agrees that its personnel will comply with all reasonable Vendor safety and security procedures, reimburse Vendor for any additional costs resulting from such presence and to obey the reasonable instructions of Vendor's pilots during such flights.

e.    During the Term, Vendor agrees to assist Pictometry in the temporary installation in and removal of individual components of Pictometry Technology, or as necessary, the complete Pictometry Technology system, in or from Aircraft in accordance with the training and documentation to be provided by Pictometry. Vendor and its personnel shall assist Pictometry in the installation and removal of the Pictometry Technology only when such assistance is requested by or approved in advance by Pictometry. To the extent Vendor assists Pictometry in installation and removal of the Pictometry Technology, Vendor shall not, so long as it utilizes reasonable care in providing such assistance, be liable for damage to the Pictometry Technology resulting from such installation or removal. Pictometry will be responsible for installation and removal of the complete Pictometry Technology system at the start and end of the Operating Period and, as needed, for Scheduled Preventive Maintenance (as hereinafter defined).

f.    Vendor shall operate the Aircraft in accordance with all applicable federal and state laws and other regulations, including without limitation Federal Aviation Administration ("FAA") rules and regulations and those with respect to qualification and employment of its pilots. Vendor shall notify Pictometry within three (3) business days of any notification by the FAA or other governmental authority of any infraction, action, or impending action against Vendor for any reason, and regardless of whether or not the infraction, action, or impending action relates to an Aircraft or pilots designated for providing Pictometry Services as provided herein.

g.    During the Term, Vendor agrees to devote Vendor's best efforts, skills and business time and attention as needed to properly provide the Pictometry Services hereunder. During the Term, Vendor shall not engage in or render services for any other business in any manner that prevents or interferes with Vendor's provision of the Pictometry Services hereunder and Vendor shall not engage or assist others in engaging in competition with Pictometry by providing services to capture geo-referenced oblique imagery for any other party within the continental United States.

## 2.    Aircraft and Pilot Availability

a.    Subject to Paragraph 9 below, Vendor shall provide piloted Aircraft for Pictometry Services seven (7) days per week. Each Aircraft shall be available twelve (12) hours per day, with a qualified pilot available eight (8) hours per day, for each Aircraft. As requested by Pictometry, flight times shall be conducted within the image capture window. The image capture window for purposes of this Paragraph 2 is considered to be 2 hours after sunrise to 2 hours before sunset. However, flight times may be requested prior to and after the image capture window to transport Aircraft to and from the designated image target area. Vendor acknowledges that Pictometry's ability to timely provide Pictometry Product to its own customers is a material element of the performance of Pictometry Services pursuant to this Agreement, and that Vendor obligations under this Paragraph 2 are intended to ensure that Vendor maintains the availability of Aircraft for performance of Pictometry Services throughout the Term. Any obligation to provide Aircraft and pilots as set forth in this Agreement is subject to the Force Majeure provisions set forth in Paragraph 14, below.

b.    Aircraft keys shall be provided to Pictometry personnel by Vendor for access to Aircraft cabins for maintenance of the Pictometry Technology (e.g., the flight rig or other capture equipment) and flight preparation at times when Vendor's pilots are off-duty. Pictometry agrees that its personnel will comply with Vendor's reasonable rules and procedures and security of Aircraft including, but not limited to, Pictometry personnel not moving or operating Aircraft.

c.    Aircraft will be initially be deployed pursuant to this Agreement from December 15, 2015 through May 15. 2016 and thereafter shall be deployed from each subsequent October 15 through May 15 throughout the Term, each such period of deployment constituting an "Operating Period".

## 3.    Term

This Agreement shall commence on the Effective Date and shall continue in effect for a period of two (2) years (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive additional one year

Page 2 of 9

Air Services Agreement - Sandhills Aviation LLC 150826 1

terms on the same terms and conditions (each such renewal constituting a "Renewal Term" and, collectively with the Initial Term, constituting the "Term"). The above notwithstanding, either Party may, in its sole discretion, terminate this Agreement at the end of the Initial Term or any Renewal Term by providing written notice to the other Party of such termination not less than ninety (90) days prior to the end of the then-current Term.

### 4.  Compensation

a.    For performance of the Pictometry Services under this Agreement Vendor shall, with respect to each Operating Period during the Term, be paid the minimum monthly charge specified on Schedule A to this Agreement (the "Minimum Monthly Charge") per Aircraft. The Minimum Monthly Charge covers forty (40) hours use of such Aircraft (the "Monthly Minimum Hours"), including pilot and administrative charges, during the month of the Operating Period to which it relates, subject to adjustments for: (i) any increases in fuel charges pursuant to Paragraph 4.b below; and (ii) any decreases resulting from suspension of service pursuant to Paragraph 9, below. Aggregate Type Fleet hours flown in any month in performance of the Pictometry Services in excess of an amount equal to the product obtained by multiplying the Monthly Minimum Hours by the number of Aircraft within that Type Fleet will be billed when incurred at the rate per excess hour specified in Schedule A for such Type Fleet. For the purposes of clarification, the Minimum Monthly Charge and any additional hourly charges paid by Pictometry pursuant to this Agreement include and cover the costs of use of the Aircraft, the pilots (including all pay and benefits), the Aircraft fuel (subject to Paragraph 4.b, below), oil, maintenance, repair and all Aircraft landing and parking fees ("Covered Items"). Unused Monthly Minimum Hours for each Type Fleet shall be carried forward and credited against future overages for that same Type Fleet within the then-current Term. Once the aggregate Type Fleet Monthly Minimum Hours are used in the performance of Pictometry Services in a given month during the Operating Period and all previously unused Type Fleet Monthly Minimum Hours carried forward and credited have been exhausted, Vendor shall invoice Pictometry monthly for each additional hour of use of each Aircraft in the Type Fleet during the month at the rate per excess hour specified in Schedule A for the Type Fleet of such Aircraft.

b.    For each month in each Operating Period, Vendor shall calculate the actual average price per gallon paid by Vendor for fuel used in performing the Pictometry Services (the "Actual Cost") for each Type Fleet and the difference between the Actual Cost and the standard cost per gallon of fuel specified on Schedule A for such Type Fleet (the "Standard Cost"). If the Actual Cost per gallon of fuel paid by Vendor for a Type Fleet during a month is less than the Standard Cost for such Type Fleet, Vendor shall pay Pictometry the resulting difference in total costs for fuel used by such Type Fleet during the month by check on or before the last day of the next month. If the Actual Cost per gallon of fuel paid by Vendor for a Type Fleet during a month is more than the Standard Cost for such Type Fleet, Vendor shall notify Pictometry in writing of that fact and Pictometry shall pay Vendor the resulting difference in total costs for fuel used by such Type Fleet during the month by check on or before the last day of the month following the month in which such notice was received.

c.    Pictometry shall reimburse Vendor monthly at the rate specified on Schedule A for travel per diems properly paid by Vendor to its pilots performing the Pictometry Services requiring travel away from the Pictometry-approved Vendor base location for the corresponding Aircraft during the Operating Period.

d.    Pictometry shall reimburse Vendor monthly for hanger fees incurred while Aircraft are performing the Pictometry Services requiring travel away from the Pictometry-approved Vendor base location for the corresponding Aircraft during the Operating Period.

### 5.  Invoicing

a.    Vendor will submit two invoices per calendar month to Pictometry. The first invoice shall be sent on the first (1st) of each month with respect to all applicable Monthly Minimum Charges. This invoice will be due and payable within twenty (20) business days of receipt of invoice from Vendor. A second invoice shall be submitted by Vendor to Pictometry for the previous month's reimbursable additional expenses, such as travel per diems, hanger fees and Aircraft hours in excess of the Fleet Monthly Minimum Hours less any unused hours carried forward, as the case may be, as provided in this Agreement. Vendor's invoice will include an adequately detailed description of the additional time and expenses being billed to Pictometry, as well as receipts supporting fuel expenditures and other reimbursable expenses, to facilitate verification. The second monthly invoice shall be sent to Pictometry by the fifth (5th) day of the month and payment shall be due and payable by the last day of the month.

b.    In the event Pictometry fails to make payment to Vendor on the last day for which payment is due, Vendor shall send written notice to Pictometry of its failure to pay, which shall be deemed notice of breach pursuant to Paragraph 10.  Payment of any disputed sums by Pictometry shall not be deemed an admission or acceptance of any disputed amount by Pictometry provided the payment is made under protest and identifies the dispute.

## 6.  Intellectual Property & Equipment

Vendor recognizes the proprietary nature and the value of Pictometry Technology and all other intellectual property of Pictometry including, without limitation, as described in specifications provided to Vendor and agrees that:

a.    Pictometry Technology is a commercially valuable, proprietary product of Pictometry, the design and development of which reflect the effort of skilled scientists and technicians and the investment of considerable time and resources.  Pictometry Technology is treated by Pictometry as confidential and contains substantial trade secrets of Pictometry.  Pictometry is entrusting these trade secrets to Vendor and its employees and agents in confidence solely so that Vendor may perform the Pictometry Services and its other obligations under this Agreement and for no other purpose whatsoever.  Vendor agrees that it will not at any time, disclose, discuss, provide a copy of, or disseminate the Pictometry Technology, or any part thereof to any person other than those who specifically need to obtain access thereto or knowledge thereof in order to perform Pictometry Services and its other obligations under this Agreement.  Vendor agrees to use all reasonable efforts to ensure: (i) that access to the Pictometry Technology and each part thereof will be strictly limited to employees who are authorized to use the Pictometry Technology in accordance with the terms of this Agreement; and (ii) that Vendor's own personnel and any others afforded access to the Pictometry Technology, including maintenance and repair crews for the Aircraft, will protect it against unauthorized use, disclosure, copying, and dissemination; (iii) that neither Vendor or its personnel shall disclose the purpose of its work under this Agreement except on an as needed basis in order to perform the Pictometry Services.

b.    Vendor agrees that, in connection with the performance of the Pictometry Services, Vendor will use best efforts to assure that its own personnel and any other third Parties who may have access to Pictometry Technology, including without limitation any software which is part of the Pictometry Technology, will not unlock, decompile or reverse engineer or otherwise disassemble any part of the Pictometry Technology, so as to find, uncover or disclose the source code or other trade secrets included therein or for any other purpose.

c.    Vendor shall use best efforts to ensure that persons employed by it, or under its direction and control, abide by the terms and conditions of this Agreement.  Pictometry shall have the right, in its sole discretion, to require each Vendor officer, employee, and agent with access to the Pictometry Technology, to execute confidentiality and trade secret agreements to protect its rights in the Pictometry Technology.

d.    The obligations of Vendor set forth in this Paragraph shall continue to be binding upon Vendor and its officers, employees, and agents after the expiration or termination of this Agreement.

e.    Vendor acknowledges and agrees that Pictometry shall have and retain sole and exclusive ownership and all right, title, and interest in and to all parts of the Pictometry Technology, and all copyrights, patents, and other proprietary rights in or associated with the Pictometry Technology and Pictometry software, including, but not limited to the data and images which are created from Vendor's services under this Agreement utilizing the Pictometry Technology and Pictometry software (the "Proprietary Rights").  Vendor agrees: (i) that it will not, during or after the Term, assert or claim any interest in, or do anything directly or indirectly that may adversely affect the validity of or infringe any Proprietary Rights; (ii) that it will use best efforts to protect the Proprietary Rights and to cooperate in Pictometry's efforts to protect the property of Pictometry, including the Pictometry Technology and Proprietary Rights, as Pictometry may from time to time instruct; and (iii) that it will notify Pictometry promptly of any known or suspected breach of any Proprietary Rights that comes to Vendor's attention.

f.    The Parties agree that the unauthorized use or disclosure of the Pictometry Technology by Vendor and/or its officers, employees, or agents would cause irreparable harm to Pictometry and that any breach or threatened breach by Vendor and/or its officers, employees, and agents of any provision of this Paragraph 6 cannot be remedied solely by damages.  Accordingly, in the event of a breach or threatened breach by Vendor and/or its officers, employees, and agents of any of the provisions of this Paragraph 6, Pictometry shall be entitled to seek injunctive relief restraining Vendor and any business, firm, partnership, individual, corporation, or other entity participating in the breach or threatened breach.  Nothing herein, however, shall be construed as prohibiting Pictometry from pursuing any other remedies available at law or in equity for any such breach or threatened breach, including the recovery of damages, costs, and reasonable attorney's fees.  If any part of this Paragraph 6 is found by a court of competent jurisdiction to be unreasonably broad, it shall nevertheless be enforceable to the extent reasonably necessary for the reasonable protection of Pictometry.

Page 4 of 9

g.    Vendor acknowledges that it has no proprietary interest in the Pictometry Technology or the Proprietary Rights, nor will it acquire any such interest as a result of this Agreement, and shall take all reasonable actions to protect the Pictometry Technology and Proprietary Rights from all claims, including claims of the Vendor's creditors, secured, unsecured, and any lien claimants. If requested, the Vendor will secure a written acknowledgment from any secured creditor that such secured creditor has no interest in the Pictometry Technology or Proprietary Rights. In the event that any creditor advances a claim against any Aircraft, Vendor will immediately notify Pictometry in writing and if requested by Pictometry, facilitate the immediate removal of the Pictometry Technology.

## 7. Aircraft Modification Documents

a.    To the extent there are any required modifications to any Aircraft required to perform the Pictometry Services, Vendor shall cause such modifications to be made to meet Pictometry's requirements. Vendor agrees that prior to its implementation of the modifications to any Aircraft, that it will provide a copy of the proposed plans and documentation for such modifications to Pictometry for review and approval before beginning work or seeking FAA approvals.  Documentation regarding the modifications will be obtained and generated by Vendor in the process of performing the modifications and obtaining FAA approval, except applicable FAA forms, e.g. form 8110-3 associated with belly hole and exhaust modifications. Vendor also shall submit to Pictometry photocopies of all documentation regarding airframe modifications including internal use documents and formal documents submitted to the FAA (including Supplemental Type Certificates, Field modifications, and Designated Engineering Representative reports).  These documents will be provided within thirty (30) days of their generation or receipt by Vendor. As documents are modified with enhancements, updated documents will be forwarded to Pictometry.

b.    Where permissible, and with prior approval of the Vendor both Parties shall have unlimited rights to utilize the data and designs which are represented by these aircraft modification documents.

## 8.  Employment and Utilization of Pilots

a.    Vendor agrees that it will utilize only its own employees and/or contractors as pilots.  Vendor acknowledges and agrees that it will be responsible for the payment of all of its pilots' wages, benefits, and employment related taxes and expenses, and for any overtime, including without limitation, out of pocket food, lodging and other expenses incurred by its pilots for overnight stays in performing Pictometry Services. Vendor represents to Pictometry that all pilots performing Pictometry Services will be fully licensed commercial and instrument flight rules (IFR)-rated pilots.

b.    Vendor will supply a spare, on-call pilot for the duration of each Operating Period. The spare pilot will be fully trained and will be available to fill in and substitute for Vendor pilots on an as-needed basis.

## 9.  Aircraft Performance Requirements

a.    During the Operating Period each Aircraft shall be available and flight-ready for Pictometry's use no less than ninety percent (90%) of hours of availability specified in Paragraph 2, above. Excluded from the calculation of Aircraft availability is the time that an Aircraft is unavailable due to Scheduled Preventive Maintenance (as hereinafter defined).  Vendor shall use reasonable efforts to perform Scheduled Preventive Maintenance outside of the Operating Period. For any Aircraft for which the availability is less than ninety percent (90%) during any sixty (60) consecutive day period, Vendor shall credit Pictometry, at the rate of five hundred dollars ($500) per day of unavailability as compensation to Pictometry for missed opportunity, subject to the Force Majeure provisions provided below; provided, however, in no event shall Vendor be required to compensate Pictometry more than once for unavailability of any individual Aircraft on a single day.

b.    "Scheduled Preventive Maintenance" means all mandated maintenance and inspections required by FAA including, but not limited to, Aircraft inspections, scheduled maintenance and mandated repairs. Vendor shall use best efforts to minimize unavailability of Aircraft for Pictometry Services due to Scheduled Preventive Maintenance.

## 10.  Default/Termination

In the event of any breach of any provision of this Agreement by either Party, the non-breaching Party shall give written notice to the breaching Party of the nature of the breach, and the breaching Party shall have ten (10)

business days to remedy same. If the breaching Party has not remedied such breach within the ten (10) business day period, the non-breaching Party may terminate this Agreement effective immediately upon receipt of notice containing such termination and seek appropriate remedies at equity or law.

### 11. Records Inspection

With respect to all Aircraft used by Vendor in performing Pictometry Services, Pictometry shall have the right to review at any time, all records relating to the Aircraft and the pilots, including but not limited to Aircraft, engine, and propeller log books.

### 12. Insurance Coverage

a.   Prior to commencement of the first Operating Period and thereafter during the Term, Vendor shall obtain, maintain and furnish proof to Pictometry that Vendor has insurance coverage in effect for the following:

(i)   Workers Compensation covering all persons providing all Pictometry Services on behalf of Vendor and all risks to such persons under this Agreement;

(ii)   Comprehensive General Liability Insurance of not less than one million dollars ($1,000,000) per occurrence; and

(iii)   Aircraft Liability Insurance of not less than one million dollars ($1,000,000) per occurrence, with one hundred thousand dollars ($100,000) per aircraft passenger.

b.   All of Vendor's insurance policies, with the exception of the Workers Compensation, shall contain additional endorsements naming Pictometry as an additional insured with respect to liabilities arising in the performance of Pictometry Services hereunder and require the insurer to provide at least thirty (30) days prior written notice to Pictometry of any expiration or termination of coverage. Prior to commencement of the first Operating Period Vendor shall provide Pictometry with proof of such insurance.

c.   During the Term, Pictometry shall be responsible for obtaining and maintaining Insurance against casualty loss and damage to components of Pictometry Technology.

### 13. Indemnification

a.   Vendor agrees to and does hereby indemnify, protect, defend and hold harmless Pictometry and its officers, directors, management, stockholders, and employees from and against any and all claims, losses, liabilities, judgments, penalties, damages, actions, suits, demands, costs and expenses, including, without limitation, reasonable attorneys' fees resulting from Vendor's gross negligence or willful misconduct in the performance of its duties hereunder.

b.   Pictometry agrees to and does hereby indemnify, protect, defend and hold harmless Vendor and its officers, directors, management, stockholders and employees from and against any and all claims, losses, liabilities, judgments, penalties, damages, actions, suits, demands, costs and expenses, including, without limitation, reasonable attorneys' fees resulting from Pictometry's gross negligence or willful misconduct in the performance of its duties hereunder.

### 14. Miscellaneous.

a.   No amendment, modification or waiver of any provision of this Agreement shall be binding unless made in writing and duly signed by both Parties.

b.   Pictometry and Vendor may, through mutual agreement, by an instrument in writing extend the time for or waive the performance of any of the obligations of the other or waive compliance by the other with any of the covenants, or waive any of the conditions to its obligations, contained herein. No such extension of time or waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure unless specifically agreed to in writing.

c.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by Vendor without the prior written consent of Pictometry.

d.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of law principles.

Air Services Agreement - Sandhills Aviation LLC 150826 1

e   The Parties hereby irrevocably: (i) submit, in any legal proceeding relating to this Agreement, to the exclusive jurisdiction of any state or United States court of competent jurisdiction sitting in the State of New York, Monroe County, and agree to suit being brought in any such court; (ii) agree to service of process in any such legal proceeding by mailing of copies thereof (by registered or certified mail, if available) postage prepaid at the addresses set forth above; and (iii) agree that nothing contained herein shall affect a Party's right to effect service of process in any other manner permitted by law. The Parties hereby waive their rights to a trial by jury

f.   All notices and other communications to be given to a Party pursuant to this Agreement shall be given in writing sent to such Party at the respective address set forth above (or at such other address as such Party has specified by notice hereunder) and: (i) delivered personally; or (ii) mailed by registered or certified mail (postage prepaid, return receipt requested); or (iii) delivered by reputable overnight courier providing written receipt of delivery Notices shall be deemed given when actually received or when delivery is refused.

g.   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all previous agreements, promises, representations, understandings and negotiations, whether written or oral.

h.   In the event any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of the Agreement shall remain in full force and effect.

i.   Neither Party shall be liable for failure to perform under this Agreement due to force majeure, being for purposes of this Agreement, unforeseeable circumstances beyond such Party's reasonable control including, but not limited to, labor strikes, severe weather conditions, war, national emergency, fuel unavailability, catastrophic event, acts of terrorism and acts of God. A Party's failure to perform hereunder shall only be excused for so long as the event of force majeure continues.

j.   This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same Agreement, and shall become effective when one or more counterparts have been signed by both Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement by the duly authorized representative of each, to be effective as of the Effective Date.

| SANDHILLS AVIATION, LLC | PICTOMETRY INTERNATIONAL CORP. |
|---|---|
| By: | By: |
| Signature: | Signature: |
| Name: Steven Sherwood | Name: Linda K. Salpini |
| Title: Director of Operations/Managing Member | Title: Sr. Vice President, Finance |
| Date: 8/30/2015 | Date: 8-31-15 |

Page 7 of 9

Air Services Agreement - Sandhills Aviation LLC 150826 1

Schedule A:

Aircraft Type; Number; Billing Rates; Fuel; Standard Fuel Costs:

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rate Per Excess Hour | Pilot Per Diem Rate | Fuel Type | Standard Fuel Costs Per Gallon |
|---|---|---|---|---|---|---|
| Cessna 172 | 4 | $12,500.00 | $110.00 | $135.00 | Avgas | $3.50 |

All rates and fees except Standard Fuel Costs Per Gallon exclude applicable taxes.

Air Services Agreement - Sandhills Aviation LLC 150826.1

Schedule B:

List of Specifications for Required Aircraft Modifications

Cessna Model 172 aircraft require field modification 8110-3, specifications for which are available from Pictometry upon request.

Air Services Agreement - Sandhills Aviation LLC 150826 1

## AMENDMENT TO AIR SERVICES AGREEMENT BETWEEN PICTOMETRY INTERNATIONAL CORP. AND SANDHILLS AVIATION, LLC

THIS AMENDMENT No. 1 (this "Amendment") is made and effective as of June 1, 2016 to the Air Services Agreement dated August 1, 2015 (the "Agreement"), between Pictometry International Corp., a Delaware corporation ("Pictometry") and Sandhills Aviation, LLC ("Vendor").

The parties to the Agreement hereby agree as follows:

1. The first sentence of Section 3 of the Agreement is hereby amended to read in its entirety as follows:

   This Agreement shall commence on the Effective Date and shall continue in effect through May 31, 2019 (the "Initial Term").

2. Schedule A to the Agreement is hereby amended to read in its entirety as set forth in Attachment 1 to this Amendment.

3. The notice address for Pictometry International Corp. set forth in the Agreement is modified to read Pictometry International Corp., Attention: Legal Department, 25 Methodist Hill Drive, Rochester, New York 14623.

Except as expressly modified by this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

| PICTOMETRY INTERNATIONAL CORP. | SANDHILLS AVIATION, LLC |
|---|---|
| By: | By: |
| Signature: | Signature: |
| Name: Steven Sherwood | Name: Linda K. Salpini |
| Title: Director of Operations / Managing Member | Title: Corporate Vice President |
| Date: 6/2/2016 | Date: 6-3-16 |

Amendment 1 Sandhills Aviation 160527.1

**Attachment 1**

**Schedule A:**

Aircraft Type; Number; Billing Rates; Fuel; Standard Fuel Costs:

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rate Per Excess Hour | Pilot Per Diem Rate | Fuel Type | Standard Fuel Costs Per Gallon |
|---|---|---|---|---|---|---|
| Cessna 172 | 8 | $12,500.00 | $110.00 | $135.00 | Avgas | $3.50 |

All rates and fees except Standard Fuel Costs Per Gallon exclude applicable taxes.

To the extent any listed Aircraft is not available for use at commencement of the Term or the parties agree in writing to add additional Aircraft to this Agreement during the Term, the Monthly Minimum Charges applicable to each such Aircraft shall commence upon the date such Aircraft is first made available for use pursuant to this Agreement; provided, however, that because Monthly Minimum Charges are calculated on a calendar month basis, the Monthly Minimum Charges for the first calendar month in which an Aircraft is made available for use pursuant to this Agreement shall be prorated based upon the number of days of that calendar month that such Aircraft is available for use pursuant to this Agreement.

Amendment 1 Sandhills Aviation 160527.1

## AMENDMENT NO. 2 TO AIR SERVICES AGREEMENT BETWEEN
## PICTOMETRY INTERNATIONAL CORP. AND
## SANDHILLS AVIATION, LLC

THIS AMENDMENT NO. 2 (this "Amendment") is made and effective as of July 23, 2018 (the "Amendment Effective Date") to the Air Services Agreement dated August 1, 2015, as, to the extent applicable. previously modified by addenda or amendments thereto (collectively, the "Agreement"), between Pictometry International Corp., a Delaware corporation ("Pictometry") and Sandhills Aviation LLC, a Nebraska limited liability company ("Vendor"). Capitalized terms used but not otherwise defined in this Amendment have the respective meanings given in the Agreement.

WHEREAS, Vendor provides Pictometry with the Pictometry Services as set forth in the Agreement; and

WHEREAS, Pictometry and Vendor wish to modify Schedule A attached to the Agreement as set forth in herein.

NOW THEREFORE, in exchange for the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged. the Parties agree as follows:

1.  As of the Amendment Effective Date, Schedule A attached to the Agreement is deleted and replaced in its entirety with the Schedule A attached hereto.

2.  In the event of a conflict between or among the provisions of the Agreement and this Amendment, the provisions of this Amendment shall control.

3.  Except as otherwise provided in this Amendment, the Agreement shall remain in full force and effect in accordance with its original terms.

IN WITNESS WHEREOF, the Parties have executed this Amendment by their duly authorized representatives as of the Amendment Effective Date.

PICTOMETRY INTERNATIONAL CORP.      SANDHILLS AVIATION, LLC

By: _____       By: _____

Name: Erica M. Womer                Name: Steven Sherwood

Title: Corporate Vice President     Title: Co-President / Chief Operating Officer

Date: 7/16/18                       Date: 7/16/2018

Page 1 of 2

Sandhills Aviation, LLC  Amendment No 2 to Air Services Agreement_7-13-18

Schedule A

**I.  Aircraft Type; Number; Billing Rates; Fuel; Standard Fuel Costs:**

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rate per Excess Hour | Pilot Per Diem Rate | Fuel Type | Standard Fuel Cost (Per Gallon) |
|---|---|---|---|---|---|---|
| Cessna 172 | 8 | $12,500.00 | $110.00 | $135.00 | Avgas | $3.50 |
| Piper Aztec | 5 | $16,000.00 | $300.00 | $135.00 | Avgas | $3.50 |

All rates and fees except for Standard Fuel Costs Per Gallon exclude applicable taxes

To the extent any listed Aircraft is not available for use at commencement of the Term or the Parties agree in writing to add additional Aircraft to the Agreement during the Term, the Monthly Minimum Charges applicable to each such Aircraft shall commence upon the date such Aircraft is first made available for use pursuant to the Agreement; provided, however, that because Monthly Minimum Charges are calculated on a calendar month basis, the Monthly Minimum Charges for the first calendar month in which an Aircraft is made available for use pursuant to the Agreement shall be prorated based upon the number of days of that calendar month that such Aircraft is available for use pursuant to the Agreement.

## AMENDMENT TO AIR SERVICES AGREEMENT BETWEEN
## PICTOMETRY INTERNATIONAL CORP. AND
## SANDHILLS AVIATION, LLC

THIS AMENDMENT No 3 (this "Amendment") is made and effective as of July 17, 2019 to the Air Services Agreement dated August 1, 2015, as, to the extent applicable, previously modified by addenda or amendments thereto (collectively, the "Agreement"), between Pictometry International Corp., a Delaware corporation ("Pictometry") and Sandhills, LLC ("Vendor").

WHEREAS, Vendor provides Pictometry with the Pictometry Services as set forth in the Agreement; and

WHEREAS, Pictometry and Vendor wish to modify Schedule A attached to the Agreement as set forth herein.

NOW THEREFORE, in exchange for the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. As of the Amendment Effective Date, Schedule A attached to the Agreement is deleted and replaced in its entirety with the Schedule A attached hereto.

2. In the event of a conflict between or among the provisions of the Agreement and this Amendment, the provisions of this Amendment shall control.

3. Except as otherwise provided in this Amendment, the Agreement shall remain in full force and effect in accordance with its original terms.

IN WITNESS WHEREOF, the parties have executed this Amendment by their duly authorized representatives as of the Amendment Effective Date.

**PICTOMETRY INTERNATIONAL CORP.**    **SANDHILLS AVIATION, LLC**

Signature: _____    Signature _____

Name: _____    Name: _Steven Sherwood_

Title: _____    Title: _President_

Page 1 of 2

Sandhills Aviation LLC Amendment No 3 to Air Services Agreement_7.17.19

## Schedule 1

**I.  Aircraft Type; Number; Billing Rates; Fuel; Standard Fuel Costs:**

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rates Per Excess Hour | Pilot Rate Per Diem Rate | Fuel Type | Standard Fuel Cost (Per Gallon) |
|---|---|---|---|---|---|---|
| Cessna 172 | 8 | $12,500.00 | $110.00 | $150.00 | Avgas | $3.50 |
| Piper Aztec - Penta | 5 | $16,000.00 | $300.00 | $150.00 | Avgas | $3.50 |
| Piper Aztec Turbo - BigEye | 2 | $21,000.00 | $525.00 | $150.00 | Avgas | $3.50 |
| Piper Aztec - BigEye | 1 | $20,000.00 | $500.00 | $150.00 | Avgas | $3.50 |

All rates and fees except for Standard Fuel Costs Per Gallon exclude applicable taxes.

To the extent any listed Aircraft is not available for use at commencement of the Term or the Parties agree in writing to add additional Aircraft to the Agreement during the Term, the Monthly Minimum Charges applicable to each such Aircraft shall commence upon the date such Aircraft is first made available for use pursuant to the Agreement; provided, however, that because the Monthly Minimum Charges are calculated on a calendar month basis, the Monthly Minimum Charges for the first calendar month in which an Aircraft is made available for use pursuant to the Agreement shall be prorated based upon the number of days of that calendar month that such Aircraft is available for use pursuant to the Agreement.

The parties agree that the Term for all of the Cessna 172 shall start as of the date of this Amendment and continue through September 15, 2020.  At which time, the aircrafts may be renewed as set forth in the Agreement.

The parties agree that the Term for all of the Piper Axztec - Penta, Piper Aztec Turbo - BigEye and the Piper Aztec - BigEye shall start as of the date of this Amendment and continue through September 15, 2022.  At which time, the aircrafts may be renewed as set forth in the Agreement.

# EXHIBIT B

≡/eagleview™

Mr. Jay Martin
Eagle View Technologies, Inc.
10900 NE 4th St. Suite 800
Bellevue, WA 98004

January 13, 2020

Mr. Steven Sherwood
Sandhills Aviation LLC
1464 East 34th Street
Wahoo, NE 68066

Re: Assurance of Efficiencies in the Business

Dear Steven,

The purpose of this Letter is to ensure that the business relationship between Sandhills Aviation LLC ("Sandhills") and Eagle View Technologies, Inc. ("EagleView") continues efficiently in accordance with the relevant Agreements, and to allow for a more streamlined processing of expenses and payments to Sandhills and its vendors.

In consideration of EagleView deferring the repayment to July 2020 for the amount of approximately two hundred fifty thousand dollars ($250,000) that Sandhills owes EagleView for overbillings for aircraft and insurance claims, Sandhills agrees to the following:

1.  With EagleView's forty-eight (48) hours prior notice, provide insight to Sandhills finances such as cash in-flows and out-flows on a day-to-day basis, by providing to EagleView, Sandhills' financial documents, primarily in the form of bank statements, daily bank transaction logs, and general ledger transaction details;

2.  Allow EagleView to directly pay third party invoices for maintenance or parts which are necessary for the performance of the services, and provide in the first week of each month an estimated cost forecast for maintenance/parts per Aircraft;

3.  Provide insight to Sandhill's Wahoo hangar lease regarding the terms and costs; and

4.  Execute the services with the number of PODs Sandhills is currently operating.

If the above conditions are satisfied, EagleView will not draw amounts towards the remaining amounts owed until beginning with your July invoice.

This Letter is not intended to create or impose any fiduciary duty on either party, or their respective affiliates.

Please acknowledge that you agree with the above by signing below.



Best Regards,

Jay Martin
Chief Operating Officer

Acknowledgement:

Signature: _____

Name: Steven Sherwood

Date: 1/14/2020

# EXHIBIT C



May 29, 2020

Attention: Mr. Steve Sherwood
Sandhills Aviation, LLC
6800 Whitewater Lane
Lincoln, Nebraska 68521

(Delivered via Federal Express and email at steven.sherwood@sandhillsaviation.com)

Attention: Mr. Steve Sherwood
Sandhills Aviation, LLC
1464 E. 34th St
Wahoo, Nebraska 68066

Re: Notice of Breach of (a) Air Services Agreement dated August 1, 2015, as amended (the "2015 Agreement"), and (b) Air Services Agreement dated October 19, 2018, as amended (the "2018 Agreement")

Dear Mr. Sherwood:

This letter is to provide Sandhills Aviation, LLC ("Sandhills") with formal notice of its breach of the 2015 and 2018 Agreements with Pictometry International Corp ("Pictometry") as identified above. As you know, these Agreements govern Sandhill's duties and responsibilities to maintain and provide uninterrupted aircraft availability that is critical to Pictometry's business. As identified more specifically below, for many months now Sandhills has breached these critical duties resulting in damage and uncertainty to Pictometry's flight operations, and more importantly, to Pictometry's confidence that the aircraft can be operated in conformance with applicable Federal Aviation Administration ("FAA") requirements. For these reasons which are explained more specifically below, Pictometry provides this notice.

**Sandhills' Duty to Provide Safe Operational Aircraft for Pictometry's Uninterrupted Use During Its Critical Peak Operating Period.**

As Sandhills is well aware, the central purpose of the 2015 and 2018 Agreements was for Sandhills to provide aircraft that were properly maintained and could be operated safely during the critical Peak Period[1] of Pictometry's business. In simple terms, this meant that Sandhills was required to maintain the planes in compliance with FAA and other flight safety requirements so that the planes could be safely operated during peak daylight hours seven days

---

[1] Capitalized terms used in this letter, unless otherwise defined herein, refer to the same capitalized terms in the 2015 and 2018 Agreements.

1



a week in order to take the pictures that constitute Pictometry's business. For this reason, the 2015 and 2018 Agreements included various provisions to require that Sandhills provide this service in order to avoid uncertainty and damages to Pictometry's business, and more importantly to ensure safe flight operations.

Accordingly, the 2015 Agreement, as amended, included the following requirements (with emphasis supplied):

- "[Sandhills shall] Provide to Pictometry the Services of the aircraft specified . . . **Each Aircraft shall be provided as a fully-managed, maintained, airworthy, licensed under applicable law, operational aircraft,** with qualified pilots suitable for use as a piloted airborne platform to perform the Pictometry Services within the continental United States as needed by Pictometry." See Section 1(a).

- "**[Sandhills] shall operate the Aircraft in accordance with** all applicable federal and state laws and other regulations, including without limitation **the Federal Aviation Administration ("FAA") rules and regulations** ...." See Section 1(f).

- "**[Sandhills] agrees to devote [Sandhill's] best efforts, skills and business time and attention as needed** to properly provide the Pictometry Services hereunder." See Section 1(g).

- "**[Sandhills] shall provide piloted Aircraft** for Pictometry Services **seven (7) days per week.** Each Aircraft shall be available **twelve (12) hours per day** with a qualified pilot available eight (8) hours per day, for each Aircraft. As requested by Pictometry, flight times shall be conducted within the image capture window. The image capture window . . . is considered to be 2 hours after sunrise to 2 hours before sunset. . . **[Sandhills] acknowledges that Pictometry's ability to timely provide Pictometry Product to its own customers is a material element of the performance of Pictometry Services pursuant to this Agreement, and that [Sandhills'] obligations under this Paragraph are intended to ensure that [Sandhills] maintains the availability of Aircraft for performance of Pictometry Services throughout the Term."** See Section 2.

- "During the Operating Period **each Aircraft shall be available and flight-ready for Pictometry's use no less than ninety percent (90%) of hours of availability specified in Paragraph 2** ...." See Section 9(a).

Similarly, the 2018 Agreement included the following requirements (with emphasis supplied):

2



- "Sandhills shall manage the maintenance and operation of the Aircraft so as to perform the Pictometry Services **and shall use its reasonable best efforts to minimize interruption thereof**.  Such management shall consist of . . . (ii) coordinating with Pictometry to dispatch Aircraft and pilots to perform the Pictometry Services, (iii) **communicating and resolving any issues with Pictometry or any third parties, as appropriate, which prevent or hinder Sandhills from performing the Pictometry Services** . . . (v) **performing, making appropriate arrangements for and/or monitoring, as applicable, the . . . maintenance and repair of the Aircraft at the facilities operated by Sandhills**."  See Section 1(a).

- "Sandhills shall **maintain and repair the Aircraft . . . to the applicable Aviation Authority standards** . . . [and] [t]o further expedite the repair of Aircraft, Sandhills shall maintain an inventory of parts and equipment which are commonly and regularly replaced and shall have any parts or equipment purchased by Sandhills in the repair of the Aircraft shipped using overnight delivery."  See Section 1(b).

- "Each Aircraft shall be operated by Sandhills to perform the Pictometry Services **as a fully-managed, maintained, airworthy . . . operational aircraft** with qualified pilots suitable for use as a piloted airborne platform to perform the Pictometry Services within the United States and Canada as needed by Pictometry."  See Section 1(c).

- "During the Term and any renewal term, if any, **Sandhills agrees to devote Sandhills' reasonable best efforts, skills and business time and attention as needed to properly provide the Sandhills Services**."  See Section 1(h).

- "Sandhills shall **provide in service Aircraft for Pictometry Services seven (7) days per week.  Each in service Aircraft shall be available twelve (12) hours per day**."  See Section 1(i).

- Sandhills' performance shall result in each aircraft complying with a Hobbs Ratio requirement of 0.4, meaning that at least 40% of the aircraft engine hours are used as Capture Hours (the aircraft in flight taking pictures). See Section 9.

- **Sandhill's failure to satisfy the performance metrics (Hobbs Ratio) "for all in service Aircraft on average … for at least 25% of the Peak Time of the year" allows Pictometry to terminate the 2018 Agreement immediately.** See section 10 as amended by Amendment 2.

3



Both the 2015 and 2018 Agreements also included in Paragraph 6  confidentiality provisions that limited the disclosure of Pictometry's technology, and other  intellectual property and trade secret information to persons on a strictly need to know basis.

**Sandhills' Breach of Its Contractual Obligations**

Despite the importance of Sandhills' performance of these express provisions to Pictometry's business operations, over the last several months Sandhills has failed to fulfill these obligations, such that Pictometry has been forced to make significant efforts to assist Sandhills with rectifying its failures and improving its performance. Specifically, Pictometry has had personnel on–site at Sandhills' Wahoo maintenance facility beginning in January 2020 to monitor and try to remediate the maintenance deficiencies.

In addition, because of Sandhills' deteriorating financial condition, Pictometry agreed to defer Sandhills' significant financial obligation to repay approximately $250,000.00 owed to Pictometry for overbillings for aircraft maintenance and insurance claims. A copy of the January 13, 2020 letter agreement is attached hereto for your easy reference. However, this letter agreement conditioned Sandhills' right to deferral upon its satisfaction of certain conditions, including at paragraph 4 that Sandhills  "[e]xecute the services with the number of PODs Sandhills is currently operating." For the reasons stated below, Sandhills has failed to satisfy this condition, and Pictometry has therefore offset the remaining amount owed by Sandhills to Pictometry of $222,136.27 (calculated as $110,136.27 owed for the repairs for aircraft N1SY discussed below and the two remaining $56,000.00 monthly payments) from the $214,574.46 that Pictometry would otherwise have paid Sandhills for invoices 236 Rev 1 and 235. This leaves a balance still owed by Sandhills to Pictometry of $7,561.81, which Pictometry demands that Sandhills promptly pay.

Despite Pictometry's good faith efforts and extensive communications with Sandhills aimed at correcting the performance issues, Sandhills' performance has continued to deteriorate as evidenced by the following occurrences:

- **Wahoo Operations Safety Concerns**: Due to identified gaps in oversight at the Sandhills' Wahoo, NE maintenance facility, Pictometry deployed its own FAA Inspection Authority (IA) to the site from January 20 – May 1, 2020 to oversee maintenance of Pictometry aircraft. Specific breakdowns which led to the decision to base Pictometry personnel at the Wahoo facility include: mis-wired camera installation kits creating a potential fire hazard, expired Emergency Locator Transmitter batteries, and improper logbook entries. The Pictometry IA subsequently grounded thirteen (13) aircraft carrying the next generation BigEye capture system to perform safety inspections over a five-day period

4



resulting in damages of $1,607,125.00.[2] The enhanced oversight required by Pictometry IAs at the Wahoo facility cost Pictometry $12,500. Demand is made upon Sandhills for reimbursement of these damages.

While at Sandhills' Wahoo maintenance facility, Pictometry IA personnel observed significant safety concerns that included, but are not limited to, an absence of necessary calibrated tools and equipment, including torque wrenches, precision measure tools, and scale used to calculate aircraft weight and balance; fire extinguishers not accessible, not hung on the walls, and which block access; failure to clearly mark fire and/or emergency exits and walkways; absence of required current aircraft data, manuals, airworthiness directives, service information; failure to use required personal protection equipment; omission of morning safety meeting; aircraft fuel stored in open containers (5 gallon buckets) overnight and for extended periods of time, with some stored in open containers close to open flame heaters and energized extension cords; absence of defined proper way to de-fuel aircraft and to ground aircraft during process; air hoses, extension cords and tools consistently scattered across facility floor creating trip hazard; and an absence of proper tools control program. In sum, the shop is not organized and run as an FAA compliant maintenance facility; instead, the facility, equipment and personnel are very disorganized, and nothing is in place, making it virtually impossible for mechanics to work in a focused environment necessary to avoid mistakes. These deficiencies create critical concerns with the safe maintenance and operation of the aircraft.

- **Problems with N6944A:** As communicated in Pictometry's letters to Sandhills on January 24 and March 3, 2020, Sandhills released this BigEye aircraft following its 100 hour AW maintenance without replacing the heater fuel regulator shutoff valve that was 29.7 hours overdue for replacement. This failure created a danger of fire and carbon monoxide poisoning, as well as delayed the return of the aircraft to the flight line. More specifically, the aircraft was removed from availability for 14 days (from January 23, 2020 to February 7, 2020), causing Pictometry to suffer damages of $346,150.00, and demand is made upon Sandhills for payment of these damages. In addition, because of these conditions, Pictometry, at its own cost, had to dispatch three (3) employees to spend a half-a-day each investigating this issue (because if this was a systemic issue, it would have required the grounding of the entire fleet), as well as one (1) employee to assist with verification

---

[2]    Pictometry's damages for lost revenue for the days when the aircraft were unavailable are at least $13,750/day for aircraft under the 2015 Agreement, and $49,450/day for aircraft under the 2018 Agreement, which daily charges Pictometry has used in the damages calculations in this letter. Since these amounts do not capture all of Pictometry's damages, Pictometry reserves the right to supplement the damages claims in the future.



of log books. This cost Pictometry $938.00 in employee costs, and demand is made upon Sandhills for reimbursement of these damages.

- **Intentionally Withholding Seven Aircraft From Service Due to Internal Disputes Between Sandhills' Members/Former Members**: We have been informed that the controlling member of Sandhills, Mr. Sherwood, is involved in a dispute between members of the Bentley family related to the parties' performance under an agreement whereby the Sherwoods bought the Bentley's membership interest in Sandhills. We understand that this purchase agreement included certain provisions for the Bentley's separate maintenance facilities, as opposed to Sandhills' facilities, to have a priority right to maintain the Pictometry aircraft, and that disputes have arisen regarding these duties and related payments. This dispute has adversely spilled over to and impacted performance of the 2015 and 2018 Agreements, such as from April 17-21, 2020, when the Bentleys unilaterally withheld seven (7) aircraft from service, five (5) of which were Penta and two (2) of which were BigEye. This wrongful removal of the seven (7) planes from service caused Pictometry to suffer damages of $586,775.00, and demand is made upon Sandhills for payment of these damages.

Most recently, we have learned that the Bentleys and the Sherwoods are actively involved in litigation over the control of Sandhills, with the Bentley's claiming 50% control of Sandhills while the Sherwoods claim 100% control, so that control of the company and correction of the operational problems appears impossible. Simply put, with the members fighting internally and no one apparently in control, Pictometry does not even know whom it can communicate with in regard to operational issues -- which again involve time and life safety critical matters.

- **Failure to Satisfy Performance Metrics**:  Both agreements have plain performance metrics that Sandhills has failed to satisfy.

  - With regard to the 2015 Agreement, Sandhills is required to ensure that each aircraft is maintained and operationally available 90% of the time. As evidenced by the summary attached as Exhibit A to this notice, Sandhills failed to comply with this performance requirement for 13 aircraft from November 2018 to April 2020 for a cumulative of 104 plane months when an aircraft did not meet the required performance metric, and 105 total days when these aircraft were out of service. This default caused Pictometry to suffer damages of $681,747.00, and demand is made upon Sandhills for payment of these damages.

6



| UMx + Plane-No-Pilot | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C | C | A | C | A | C | C | C | A | A | C | C | A |
| Date (month) | N1694E | N3300E | N54109 | N5484D | N6062Y | N62531 | N6449J | N64CA | N680K | N705SF | N738EF | N739CN | N95TK |
| 11/1/2018 | 99% | 96% | 100% | 79% | 0% | 84% | 100% | 100% | 0% | 53% | 100% | 93% | 56% |
| 12/1/2018 | 100% | 82% | 100% | 100% | 48% | 100% | 100% | 87% | 100% | 91% | 62% | 51% | 86% |
| 1/1/2019 | 100% | 99% | 82% | 83% | 7% | 100% | 80% | 97% | 70% | 53% | 100% | 69% | 100% |
| 2/1/2019 | 97% | 100% | 89% | 96% | 83% | 100% | 89% | 100% | 83% | 100% | 95% | 97% | 92% |
| 3/1/2019 | 93% | 100% | 61% | 100% | 62% | 100% | 74% | 95% | 100% | 81% | 70% | 99% | 97% |
| 4/1/2019 | 97% | 100% | 98% | 78% | 75% | 100% | 77% | 100% | 47% | 87% | 100% | 100% | 77% |
| 5/1/2019 | 97% | 100% | 100% | 94% | 73% | 100% | 100% | 100% | 72% | 100% | 100% | 93% | 100% |
| 6/1/2019 | 100% | 0% | 100% | 0% | 83% | 93% | 100% | 100% | 0% | 0% | 100% | 100% | 100% |
| 7/1/2019 | 100% | 100% | 74% | 0% | 84% | 100% | 100% | 100% | 0% | 48% | 97% | 98% | 96% |
| 8/1/2019 | 0% | 100% | 34% | 0% | 8% | 0% | 0% | 100% | 0% | 72% | 100% | 0% | 93% |
| 9/1/2019 | 0% | 100% | 82% | 100% | 0% | 66% | 100% | 69% | 52% | 51% | 100% | 0% | 66% |
| 10/1/2019 | 0% | 99% | 100% | 100% | 0% | 90% | 79% | 0% | 84% | 94% | 100% | 100% | 21% |
| 11/1/2019 | 100% | 100% | 100% | 91% | 100% | 100% | 98% | 100% | 100% | 83% | 100% | 89% | 0% |
| 12/1/2019 | 100% | 97% | 78% | 67% | 90% | 67% | 85% | 93% | 94% | 80% | 99% | 83% | 99% |
| 1/1/2020 | 100% | 87% | 59% | 97% | 96% | 80% | 100% | 100% | 100% | 99% | 51% | 36% | 66% |
| 2/1/2020 | 100% | 99% | 86% | 100% | 97% | 87% | 93% | 100% | 100% | 91% | 94% | 93% | 82% |
| 3/1/2020 | 87% | 100% | 95% | 100% | 95% | 100% | 97% | 100% | 100% | 90% | 100% | 93% | 100% |
| 4/1/2020 | 94% | 100% | 83% | 100% | 99% | 100% | 100% | 100% | 93% | 90% | 100% | 80% | 99% |

- o With regard to the 2018 Agreement, Sandhills was required to meet or exceed the 40% Hobbs Ratio for all in service aircraft on average for at least 25% of the Peak Time of the year, failing which the agreement may be terminated. Based on the information available to Pictometry, Sandhills failed to comply with these performance metrics as follows:

Cost Efficiency
SHA Aircraft

| | |
|---|---|
| 10/1/2018 | 14% |
| 11/1/2018 | 27% |
| 12/1/2018 | 25% |
| 1/1/2019 | 25% |
| 2/1/2019 | 29% |
| 3/1/2019 | 22% |
| 4/1/2019 | 36% |
| 5/1/2019 | 24% |
| 6/1/2019 | 27% |
| 7/1/2019 | 33% |
| 8/1/2019 | 34% |
| 9/1/2019 | 26% |

7



| | |
|---|---|
| 10/1/2019 | 28% |
| 11/1/2019 | 32% |
| 12/1/2019 | 29% |
| 1/1/2020 | 32% |
| 2/1/2020 | 39% |
| 3/1/2020 | 38% |
| 4/1/2020 | 42% |

The failure to comply with this required metric resulted in Pictometry losing 61.23 days of aircraft flight, resulting in $3,027,823.50 in damages. Demand is made upon Sandhills for reimbursement of these damages.

Pursuant to Section 10 of the 2018 Agreement, this failure alone allows termination.

- **Failure with Recent Annual for N6715A**: Rather than do the maintenance work itself, Sandhills directed a third party facility (DLK Aviation) to perform the annual maintenance for this BigEye aircraft, and billed Pictometry $17,298.52 and $33,685.38 for this work in August and November, 2019. Pictometry paid these invoices only to learn that the work was deficient, resulting in the aircraft requiring repair work at another third party facility (Landcare Aviation, Inc.), which corrected and/or re-performed this work at a cost of $87,775.75, which Pictometry also paid. Demand is made upon Sandhills to reimburse Pictometry for the cost of the corrected repairs ($87,775.75) that should have been done as part of the annual. In addition, this aircraft was unavailable for use from November 1, 2019 to February 10, 2020, a total of 100 days. This removal from service caused Pictometry to suffer damages of $2,225,250.00,[3] and demand is made upon Sandhills for payment of these damages.

- **Additional Maintenance and Safety Issues Related to Launchpad Aviation**: Pictometry deployed its own Airframe & Powerplant mechanics to the Sherwood-owned Launchpad Aviation maintenance shop as billing from this shop was materially inflated and the quality of work was poor. The Pictometry oversight resulted in five aircraft (52WW, 2JT, 776A, 484D and 62Y) being returned to service by the end of 2019, with Penta aircraft 52WW being delayed by 90 days versus the plan. At that time, Pictometry ceased allowing this maintenance facility to service Pictometry aircraft. The delay in releasing 52WW resulted in damages of $312,813.00, and the enhanced oversight required by Pictometry

---

[3]    The damages claim for unavailability of BigEye aircraft N6715A, like the damages claim for unavailability of Penta aircraft 52WW, are separate from, and not included in, the other damages claims for aircraft unavailability identified in this letter.

8



personnel cost Pictometry $225,000. Demand is made upon Sandhills for reimbursement of these damages.

- **Additional Maintenance and Safety Incidents.**

  - On May 15, 2020, Sandhills flew BigEye aircraft N54826 from Omaha Eppley Airfield to Sandhills' Wahoo maintenance facility despite per the smartsheet, the "R/H engine V band clamp broke and was melting the cowling. We will need to order the wastegate assembly and V band clamps". This condition means the exhaust was not securely attached at the turbo/wastegate, allowing the exhaust gas/heat (fire) to freely melt the cowl. This is a clear instance of Sandhills knowingly flying an aircraft with a substantial fire hazard condition. In addition, the aircraft was unavailable for use from May 15, 2020 to May 18, 2020, a total of 3 days, which caused Pictometry damages of $74,125.00. Demand is made upon Sandhills for payment of these damages.

  - On February 24, 2019, an aircraft owned by Agricultural Services LLC, a 1976 Piper PA23-250 ("N1SY") was involved in an incident during which there was damage to the underbody of the aircraft and left propeller due to landing gears becoming stuck prior to landing. At the time of the incident, Sandhills did not have this aircraft properly insured and the repairs to the aircraft cost Pictometry $110,136.27. The invoices for these repairs were provided to Sandhills by letter dated October 22, 2019. As stated above, Pictometry has included this amount in the setoff from the amounts payable for Sandhills' pending invoices (236 Rev 1 and 235), which leaves a balance still owed by Sandhills to Pictometry of $7,561.81, which Pictometry demands that Sandhills promptly pay.

  - On January 24 and 29, 2020, as well as Smartsheet communications between January 23 and February 7, 2020, and additional emails and calls on March 13, 2020, Pictometry communicated maintenance and airworthiness concerns and failures regarding aircraft  44A, 2JT, N6715A, 6RC, 52Z, 745, and76A. These communications identified improper repairs for which Pictometry later had to pay for corrective repairs totaling $344,000.00, which corrective repairs would not have been required had Sandhills properly maintained the aircraft. Pictometry paid these charges and now demands that Sandhills reimburse Pictometry for these damages.

- **Breach of confidentiality provisions.** Despite Sections 6 of the 2015 and 2018 Agreements expressly limiting Sandhills' disclosure of Pictometry's confidential information to third parties on a strictly need to know basis, Sandhills has done just the

9

opposite. Indeed, pursuant to Article 4.2(d) (iii) of the Purchase Agreement between the Bentleys and Steven Sherwood, Mr. Sherwood agreed that Sandhills would "include [the Bentleys] in any and all discussions with Pictometry and provide [the Bentleys] with all communications with Pictometry regarding terminating, modifying and amending Old Agreements." As a result, Sandhills has wrongfully disclosed to the Bentleys far more Pictometry confidential information than maintenance related information that the Bentleys might have a need to know.

These material breaches have undeniably caused significant damages to Pictometry, in an amount which is still being calculated, but which Pictometry knows at this time includes at least $9,377,682.32 as identified above. Thus, in addition to placing Sandhills on notice of these breaches, this letter is to demand that Sandhills reimburse Pictometry for these damages.

**Demand for Cure and Grounding of Aircraft Pending Cure**

Pursuant to Section 10 of the 2015 Agreement, Sandhills has ten (10) business days to cure the defaults related to such agreement, failing which Pictometry intends to terminate the agreement and seek all available remedies. Pursuant to Section 10 and Amendment 2 of the 2018 Agreement, Sandhills has sixty (60) days to cure the defaults under such agreement, failing which Pictometry intends to terminate that agreement and seek all available remedies. In addition and alternatively, pursuant to Section 10 of the 2018 Agreement, Sandhills' failure to satisfy the required performance metrics is not subject to cure and allows the immediate termination of the agreement. To the extent Sandhills disputes its failure to satisfy these metrics, demand is made upon Sandhills to provide written evidence of its alleged compliance within ten (10) days of the date of this letter, failing which we will understand that Sandhills agrees that its noncompliance authorizes the termination of the 2018 Agreement.

The above breaches evidence a wholesale lack of the proper organization, procedures, administration and operation of an FAA compliant maintenance facility. This failure is particularly critical given the unique scheduling requirements of Pictometry's business, which mandates that aircraft be available for continuous use during the Peak Operating Period. Pictometry must also consider the inherent life safety considerations associated with aircraft use, particularly where Sandhills' historical maintenance operations demonstrate significant failures and concerns that simply said, is that the aircraft maintenance processes and documentation is seriously noncompliant. This noncompliant situation is further aggravated by the internal dispute between the members and former members of Sandhills over control of the company and its operations and finances.

For these reasons, unless and until Sandhills has demonstrated appropriate curative action acceptable to Pictometry, Pictometry has no reasonable alternative at this time but to

10

immediately suspend all air operations and maintenance services with Sandhills. This action, the necessity of which was required by Sandhill's acts and omissions, will result in additional damage to Pictometry, for which Sandhills is liable. Pictometry is compiling these damages together with the other damages incurred to date, and will provide this information to Sandhills for reimbursement.

The cure for the above breaches, which are widespread and systemic, must also be widespread and systemic, and include at a minimum, among other things, producing evidence to the satisfaction of Pictometry that Sandhills' internal dispute is resolved so that the control and administration of the company is clear and focused; evidence that the company has implemented new procedures for the organization and operation of its facilities that are Parts 135 and 145 compliant; evidence that the company's tenuous finances do not impair its ability to provide the required services; evidence that the company's documentation is complete and accurate; and evidence that appropriate steps have been implemented to address and avoid similar breach incidents in the next Peak Operating Period. Demand is also made that within ten (10) days, tails N662TB, N66RC, and N54796 be flown by Sandhills to KROC to hand over to Daniel Molinari of Pictometry for inspection, and tails N2562M, N1SY, and N62745 be flown to KSXK to hand over to Kaleb Van Veldhuizen on behalf of Pictometry within the next 24 hours; keys, equipment manuals and fuel cards must be provided at the same time.

In addition, Sandhills must reimburse Pictometry for the $9,377,682.32 in damages identified above, and the additional damages it is still compiling. Finally, while a cure for Sandhills' breach of its confidentiality obligations may not be possible, at the very least, Sandhills must provide Pictometry with a list of all confidential Pictometry information disclosed to third parties including the Bentleys and their companies, together with sworn statements from such third parties that they have destroyed or returned all copies of such confidential information to Sandhills and have signed confidentiality agreements in favor of Pictometry similar to the Sandhills' restrictions.

The failure of Sandhills to timely cure will result in Pictometry's terminating the 2015 and 2018 Agreements, to the extent not already terminable. Further, upon Sandhills' failure to timely provide evidence of its compliance with the performance metrics of the 2018 Agreement, Pictometry will terminate that agreement on this alternative ground.

Finally, pursuant to Section 10 of the 2018 Agreement, termination of the 2018 Agreement

11



will also terminate the related Aircraft Acquisition and Inspection Assistance Agreement, and the Master Lease Agreement.

Sincerely,

Jay Martin

# EXHIBIT D

## SIPPLE, HANSEN, EMERSON, SCHUMACHER, KLUTMAN & VALORZ
### ATTORNEYS AT LAW

Mark M. Sipple (Retired)
Stephen C. Hansen (1947-2017)
Stan A. Emerson (Retired)
Eugene G. Schumacher
Erik C. Klutman
Neal J. Valorz

2503 13ᵗʰ Street, P.O. Box 1305
Columbus, NE 68602-1305
Phone: 402-564-2848
Fax: 402-564-3909
E-Mail: klutman@1492law.com

June 4, 2020

**RE:**    **May 29, 2020 Notice of Breach of (a) Air Services agreement dated August 1, 2015, as amended (The "2015 Agreement"), and (b) Air Services Agreement dated October 19, 2018, as amended (the "2018 Agreement")**

To Whom it May Concern:

Please accept the following on behalf of Sandhills Aviation, LLC ("Sandhills") in response to an alleged "Notice of Breach" from Jay Martin, a representative of EagleView regarding the 2015 Agreement and the 2018 Agreement (collectively sometimes referred to as "the Agreements"). This Notice of Breach is replete with factual errors which will be addressed in detail below. Sandhills categorically rejects a breach of the 2015 Agreement or a breach of the 2018 Agreement.

First and foremost, Sandhills remains ready, willing, and able to complete all obligations contained within the Agreements. Based on EagleView's express instruction, Sandhills has repositioned the following aircraft as requested: N66RC, N2562M, N1SY, and N62745. The other three (3) aircraft are undergoing maintenance or camera Pod work that you have access to. Nevertheless, Sandhills is still fully capable to comply with the terms of the Agreements. Pursuant to the 2018 Agreement, EagleView is obligated to pay a Management Fee for a minimum of seven (7) aircraft regardless of the use by EagleView. We request that EagleView continue to make payments for the duration of the Agreements regardless of the contractual work EagleView provides to Sandhills.

Second, EagleView has failed to complete its last payment owed to Sandhills. This constitutes a significant problem. Presently, EagleView is past due on two invoices: invoice 236 REV 1 for $171,304.46 and invoice 235 for $43,270.00. These amounts were approved for payment on May 8, 2020 during our regularly scheduled Friday meetings have been past due since May 26, 2020. Pursuant to the Agreements, all payments are due on a monthly basis. The Agreements do not give EagleView the right or ability to engage in self-help or setoff. EagleView is not authorized to withhold payment and is limited to making payments under protest. Specifically, "[p]ayment of any disputed sums by Pictometry shall not be deemed an

admission or acceptance of any disputed amount by Pictometry provided the payment is made under protest and identifies the dispute." Section 5(b).

The payments owed are critically important and time sensitive. As you are certainly aware, on March 30, 2019, Sandhills entered into a Purchase Agreement (the "Purchase Agreement") with Nathan Bentley, Kelli Bentley, David Bentley, Bentley Aviation Services LLC, and Meadowlark Aviation LLC (hereinafter, the "Bentleys"). Under the Purchase Agreement, EagleView provides monthly payments to the Bentleys by issuing payment to a Mutual of Omaha Bank account ending in No. 6760. EagleView's failure to make payments will cause Sandhills to be unable to continue to make payments under the Purchase Agreement. EagleView's conduct will cause Sandhills to breach its' obligations under the Purchase Agreement and EagleView will be held responsible for any such breach, as well as any consequential damages resulting from such breach.

Third, pursuant to Section 10 of the 2018 Agreement, the Parties are required to negotiate in good faith and make reasonable efforts to improve or remedy the performance prior to issuing a notice of default. Sandhills is ready, willing, and able to resolve any issues between the Parties.

Please accept the following in response to the allegations raised in the May 29, 2020 Notice of Breach. This does not constitute an exhaustive response to the allegations raised by Mr. Martin, rather a response to the allegations raised in a hope that the Parties can reach an amicable resolution and move forward under the Agreements.

## I.   Allegations of Breach of Contractual Obligations

Sandhills has complied with any and all requirements to provide safe and operational aircraft throughout the term of the Agreements. Nevertheless, Mr. Martin raises a number of allegations against Sandhills.  Sandhills disputes that there has been a material breach of any of its obligations under the Agreements.

- Sandhills "deteriorating financial condition."

This is incorrect. Every Friday Sandhills meets with EagleView representatives to discuss Sandhills' financial situation. Mr. Martin's own reports have shown that Sandhills financial condition is improving. The delays in "payments owed" Mr. Martin referenced are referencing claims that Sandhills "overbilled" EagleView in late 2018 for aircraft under a verbal agreement, despite the fact that all invoices were reviewed, audited, negotiated and approved by EagleView prior to completing payment. Sandhills' efforts to appease EagleView in the past do not constitute an acknowledgement or acceptance that any overbilling took place, rather an effort to appease EagleView, Sandhills' primary customer, undertaken in good faith.

All terms of the January 13, 2020 letter have been satisfied and Sandhills has been transparent with EagleView at all times.

2

- Wahoo Operations

In his correspondence, Mr. Martin alleges a number of maintenance and safety concerns at the Wahoo facility. Please consider this a formal request for all records, photographs, and documentation related to these allegations. While there may have been room for improvement of the Wahoo facility in the past, Sandhills has made upgrades at our Wahoo facility prior to, during, and since your newly hired IA's presence, correcting any issues raised by Mr. Martin, and has gone above and beyond to become OSHA certified, and is operating within compliance of FAA Part 91 regulations.

Mr. Martin alleges that thirteen (13) aircraft were grounded resulting in $1,607,125.00 in damages. (1) Sandhills never managed 13 planes under the 2018 Agreement; (2) Mr. Martin has provided absolutely no basis for his allegation of over $1.5 million in damages; (2) the decision to ground those planes was made solely by EagleView and done at its request; (3) Sandhills disputes the need for any additional inspections; and (4) the Parties have already entered into a release of all claims relating to the grounded planes.

We request the results of the inspections, as these additional inspections prevented Sandhills from flying for revenue during that time period.

- N6944A

Sandhills sent a letter to EagleView in response to allegations surrounding N6944A. Sandhills disputes the characterization of the events surrounding N6944A. Regardless, as a result of the release of claims signed by both parties, this is a nonissue.

- Bentley's Withholding Aircraft.

As you know, this issue was caused solely by the Bentleys unlawfully stealing aircraft from Sandhills. The facts surrounding this are more fully articulated in our Complaint for Replevin that was filed in the District Court of Douglas County, CI20-2956.

Regarding the statement that there is a dispute over control of Sandhills. As you know, this is a position that Sandhills categorically rejects. See attached a true and correct copy of the May 20, 2020 correspondence that was sent to the Bentleys concerning this issue.

- Performance Metrics

**2015 Agreement:** Sandhills disputes that it has failed to comply with the performance metrics under the 2015 Agreement.

Mr. Martin's alleged allegation that Sandhills failed to satisfy performance metrics as to the 2015 Agreement is misplaced. As you are well aware of, this clause has never been brought to the attention of or an issue to Mr. Sherwood or Sandhills prior to Mr. Martin's letter. As you indicated in your letter, this has been an issue from November 2018 to present, but we have

3

received no information or notice that there was an issue with performance.  The usual course of business that the parties have operated is through chargeback or hours rolled over to the next month.  Sandhills understanding was this was the procedure and satisfied EagleView.

Additionally, certain times during the year, planes at the request of EagleView would be brought offline and not operationally available.  Mr. Martin's alleged damages of $681,747 is misplaced, to which this damage amount includes months aircraft were offline for annual inspections, not billed, and were not in operation under the Terms of the 2015 Agreement (optional summer work).  The correct formula to calculate any possible damages if there were any from a failure to meet performance metrics is stated in the 2015 Agreement.  Pursuant to Paragraph 9a of the 2015 Agreement, it states:" Vendor shall credit Pictometry, at the rate of five hundred dollars ($500) per day of unavailability as compensation to Pictometry for missed opportunity."  Therefore, the correct calculation should be $500 per day.  Regardless,    the performance metrics were met through operations, chargebacks and hour rollovers.  Thus, no breach of the performance metrics had occurred under the 2015 agreement.

**2018 Agreement:** Sandhills disputes any failures to satisfy the performance obligations under the 2018 Agreement.

The 2018 Agreement was modified by amendments which affect the performance metrics in this immediate case.  Pursuant to Amendment #2 paragraph 9 to the air services agreement, the metrics calculation is not as to peak time as stated in Mr. Martin's letter, but 25% of the calendar year.  Thus, the letter sent last week was incorrect and stated the wrong period to calculate times.  Approximately, two months ago at the request of Mr. Sherwood, weekly meetings started occurring between Sandhills and EagleView personnel.  The purpose of these meetings was to examine, analyze, and receive feedback from EagleView as to performance metrics.  Every one of these weekly meetings was positive, and Mr. Sherwood was informed that Sandhills was meeting EagleView's metrics at all times.  Furthermore, even up to the last meeting approximately two weeks ago, Mr. Sherwood was informed that he was meeting performance metrics.  For calendar year 2020, based on what Mr. Martin noted, despite having one of the month's metrics inaccurate, for all data available, which is through April 2020, Sandhills had a 42% "cost efficiency" for the month of April, the standard Mr. Martin used in his table, which would meet this 25% metrics qualification, if you use the data category, "cost efficiency", that Mr. Martin used.

In Mr. Martin's letter, metrics as to the 2018 Agreement are being used back to October 1, 2018.  We believe any alleged past performance metrics issues which EagleView had with Sandhills is waived at this time.  Mr. Martin's letter states going back almost two years as to issues with performance.  If performance was an issue, it must have been brought up to Sandhills prior to last week.

Under Amendment #2 to the air services agreement Sandhills must have a Hobbs ratio above 40% for 25 percent of the calendar year.  This ratio can be affected by many factors not under the control of Sandhills. One recent example is the amount of time beta testing equipment for EagleView.  This beta testing Sandhills has been assisting EagleView since late 2017.  The

4

beta testing included a shift from manual focus to auto focus, 200mm lens to 220mm lens to 300mm lens upgrades, and conversion from EagleView's "BigEye" product to "GoldenEye".

Currently at this time, Sandhills disputes the performance metrics as to the 2018 Agreement. Sandhills at this time cannot compute the metrics and Hobbs ratios for one main reason. Sandhills does not know how EagleView computed its ratio to capture hours for use in its metrics calculation. Sandhills has been made aware of "revenue efficiency", "cost efficiency", and "performance efficiency" calculations throughout time but no calculations have been consistent. EagleView staff has confirmed that the metrics for the 2018 Agreement should not be used to measure performance due to the many variables and how EagleView subjectively interprets the data. Therefore, Sandhills disputes that it fell below the performance metrics requirements of the 2018 Agreement based on waiver, lack of notice, promissory estoppel, performance and other defenses.

- Alleged Failure with N6715A

Sandhills has never had a lease agreement with this aircraft. The damage claim regarding N6715A is completely erroneous.

- Additional Maintenance and Safety Issues Related to Launchpad Aviation

Mr. Martin claims that the work of Launchpad Aviation was materially inflated and the quality of the work was poor. As to the work was materially inflated this was not possible. Every invoice that was sent to EagleView for maintenance work performed by Launchpad Aviation was audited by EagleView. During this audit EagleView would make its own independent determination if the billing was fair or not. On a regular occasion if EagleView felt as though an invoice was too high for maintenance then Sandhills and EagleView would negotiate the invoice. After all the above was done, EagleView approved the maintenance invoice. All maintenance invoices from Launchpad Aviation were approved by EagleView. Thus, all maintenance invoices from Launchpad Aviation were audited, negotiated and approved by EagleView before payment was made.

As to the enhanced oversight costs it was EagleView who decided in their independent decision to send one mechanic to Launchpad Aviation. The mechanic has family in the Phoenix area and only inspected one plane, which was not N52WW. The mechanic EagleView sent refused to look at N52WW and informed Sandhills and Launchpad Aviation to proceed as planned without his assistance. EagleView instructed Sandhills and Launchpad Aviation to get N52WW in airworthy condition and to safely relocate the aircraft to EagleView's maintenance facility in St. George, Utah. On multiple occasions EagleView requested mechanics from LauchPad Aviation since the N52WW occurrence to perform maintenance on EagleView aircraft, namely N62801, N66RC, N1SY, N2562M, N62745, & N6944A. Thus, the alleged damages of personal costs of $225,000 are misplaced and denied by Sandhills.

As to alleged damages in not timely releasing 52WW are disputed. First, EagleView determined that 52WW was a low priority plane and directed Sandhills to perform on other

planes prior to 52WW. EagleView was the party who initially delayed the release of 52WW by its priority of other aircraft. Second, as a result of the release of claims signed by both parties, this is a nonissue.

- Additional Safety Incidents

May 15, 2020: Mr. Martin claims that Sandhills flew from Eppley Airfield to Wahoo despite the fact that the "R/H engine V band clamp broke and was melting the cowling." This is incorrect. The problem was not identified until the plane was at the facility in Wahoo.

February 24, 2019: An incident regarding N1SY. As you already know, Sandhills has already worked with EagleView on this issue and has agreed to accept responsibility. This money was to be repaid to EagleView as part of the January 14, 2020 letter. EagleView approved the invoices in question and only raised a concern after the fact. This matter has been resolved and Sandhills has agreed to make a payment in July.

January 24 and 29, 2020: Mr. Martin alleges $344,000 in damages related to 7 planes. First, Mr. Martin again fails to provide any basis for the damages claimed, nor does he provide any formula or calculation for his alleged damages. Second, there are Termination of Lease Agreements regarding 44A, 52Z, and 76A, releasing all claims for those airplanes. Sandhills did not lease N6715A. That leaves 2JT, 6RC, and 745, all of which are currently flying as of the date of this correspondence.

Please provide the invoices and log entries of confirm what the alleged issues were regarding these airplanes. As you know, it is not uncommon for an aircraft to be flying revenue operations and when the aircraft is brought down for a scheduled inspection to find other squawk items to be taken care of. There is no basis to believe that there were issues caused by Sandhill's mechanical staff.

- Breach of Confidentiality Provisions

Mr. Martin alleges that information was provided to the Bentleys in breach of the confidentiality provisions. First, the Bentleys were previous members of Sandhills and consequently already had knowledge of the information in question. Second, the Bentleys executed a Nondisclosure Agreement related to this information with EagleView, specifically aimed at EagleView's confidentiality concerns. Third, Chad Reinhold was aware, as was Mr. Martin, that the Bentleys required this information as they were acting as a lender to Sandhills. Mr. Martin and Reinhold each approved these disclosures on behalf of EagleView.

- Demand for Cure

Sandhills remains at all times ready, willing, and able to fulfill all rights, responsibilities, and obligations under the 2015 Agreement and the 2018 Agreement. Sandhills is fully prepared to negotiate in good faith as required under the Agreements to resolve any potential issues. However, Sandhills rejects the assertion that: (1) Sandhills has materially breached the

Agreements; and (2) the characterization that Sandhills has a "lack of proper organization, procedures, administration and operation of an FAA compliant maintenance facility." These allegations are simply false.

Control of Sandhills is clear and focused and I would again refer you to the May 20, 2020, correspondence from counsel for Sandhills regarding this issue.

Very truly yours,

SIPPLE, HANSEN, EMERSON, SCHUMACHER, KLUTMAN & VALORZ

By_____
ERIK C. KLUTMAN
ECK:dj

7

## SHERRETS BRUNO & VOGT LLC

**James D. Sherrets**
licensed in Arizona, Colorado &
Nebraska

**Robert S. Sherrets**
licensed in Kansas, Nebraska,
Missouri & Iowa

**Jason M. Bruno**
licensed in Arizona, Minnesota,
Nebraska & Texas

**Diana J. Vogt**
licensed in Nebraska

260 Regency Parkway Drive, Ste. 200
Omaha, NE 68114

8700 E Vista Bonita Drive, Ste. 236
Scottsdale, AZ 85255

Phone: (402) 390-1112
Fax: (402) 390-1163
www.sherretslaw.com
E-mail: law@sherrets.com

**James L. Schneider**
licensed in Nebraska

**Thomas G. Schumacher**
licensed in Nebraska

**Max J. Kelch**
licensed in Nebraska

May 20, 2020

Scott D. Jochim                                                         VIA E-MAIL
Croker, Huck, Kasher,
DeWitt, Anderson & Gonderinger, LLC
2120 S. 72nd Street STE 1200
Omaha, Nebraska 68124

**RE:**       *May 4, 2020 Notice of Voting Rights*

Dear Mr. Jochim:

Please accept the following in respond to your May 4, 2020 correspondence labeled "Notice of Voting Rights." This letter shall put you on notice that your position is rejected by Sandhills Aviation in its entirety. Your position is wholly without merit and we demand that you, and your clients, stop any and all activity which is causing harm to Sandhills Aviation's business. We will seek to hold all responsible parties accountable for the damages caused.

Your attempts to manufacture additional rights and responsibilities under the Agreements between the parties are not well received.

## I.       Allegations of Default

In your May 4, 2020 correspondence, you assert that the parties agreed to various terms under the Purchase Agreement that were "[i]n addition to agreeing to make payments..." However, your letter leaves out two key facts. First, that Sandhills Aviation has issued, and the Bentleys have accepted, every payment owed up to this point, totaling approximately $1,480,000 under the Purchase Agreement. Second, that the alleged "defaults" referenced are currently under dispute and being litigated in the District Court of Douglas County in *Bentley v. Sandhills Aviation*, CI 19-7290 (the "Bentley Lawsuit").

     *i.       Payments under the Purchase Agreement*

May 20, 2020
Page 2 of 4

Sherwood acquired the Bentleys' 50% ownership interest in Sandhills Aviation by entering into the Purchase Agreement. The Purchase Price was $3,500,000. $500,000 was paid immediately (the "Down Payment"), and the remaining $3,000,000 (the "Remainder") is to be paid in monthly payments over a 24 month period. The Remainder was secured by the Pledge and Security Agreement ("Security Agreement"). At your clients' insistence, the Remainder was paid directly from Pictometry ("EagleView") each month in the form of a $70,000 payment that was directly deposited into the Bentleys' account with Mutual of Omaha Bank, ending in 6760.

As of the date of this correspondence, the Bentleys have accepted the $500,000 Down Payment as well as 14 installment payments of $70,000 each to pay down the Remainder. The Purchase Agreement defines an Event of Default as the failure to make a payment of the Remainder as scheduled. No Event of Default has occurred.

Your May 4, 2020, correspondence makes material misrepresentations that Sherwood and/or Sandhills Aviation have breached the Purchase Agreement. Your suggestion that the Bentleys, through Meadowlark Aviation LLC, are entitled to exercise any voting rights is completely without merit and rejected in its entirety.

### ii.   *Pending Litigation*

Your May 4, 2020 correspondence lists a number of items which are currently the subject of two lawsuits. While you fail to outline what you are specifically claiming to be a default by Mr. Sherwood and/or Sandhills Aviation, you reference the maintenance dispute and the lease agreement. The maintenance dispute is currently pending in the Bentley Lawsuit. Specifically, **you** sought a Declaratory Judgment for the Court to determine the parties rights under the Purchase Agreement. Sandhills Aviation responded with a number of counterclaims as a result of the breaches and failures of the Bentleys under the Purchase Agreement. Nevertheless, up to this point, you have refused to provide any meaningful responses to the discovery requests that have been issued.

You further reference the Master Lease Agreement ("Lease"). While you do not assert any breach of the Lease, the Bentley's breach of the Lease is currently pending in *Sandhills Aviation v. Bentley* CI20-2956 ("Sandhills Lawsuit").

### iii.   *Response to Notice of Default*

Even assuming you were correct and a Notice of Default was properly issued under the Security Agreement, your letter fails to recognize that Sherwood issued a response to your Notice of Default. Pursuant to Section 16(j), the dispute under the Security Agreement is subject to binding arbitration. Despite the fact that there is an active dispute over *every* allegation of default you have raised, and despite the fact that a majority of these disputes are currently being litigated in the Bentley Lawsuit and the Sandhills Lawsuit, any remaining issues have not been decided by an arbitrator. Your assumption that you can engage in some form of self-help despite the fact that these issues have not been resolved is in violation of Nebraska law.

May 20, 2020
Page 3 of 4

## II.    Actions in Violation of Article 9 of the UCC

The actions taken by both the Bentleys and you violate Article 9 of the UCC. As the Security Agreement itself recognizes, the Security Agreement is subject to Article 9. (Security Agreement § 9).  Neb. Rev. Stat. § UCC § 9-602 imposes certain duties on a security party, regardless of the terms of the security contract itself.

Those duties are numerous, but include those found in Neb. Rev. Stat. § UCC §§ 9-607(c), 9-609, and 9-610.  Those provisions require a party attempting to enforce a security agreement without judicial process do so with proper notice to the securing party, do so without breaching the peace, and do so in a commercially reasonable manner.

The disputes between the Bentleys and the Sandhills Entities are clearly governed by the judicial process **you initiated** and in which the Court has yet to rule on your allegations that the Purchase Agreement has been breached.

However, your clients' decision to simply ignore the District Court action, declare victory, and attempt to seize assets of the Sandhills Entities clearly ignores and violates the Article 9 protections afforded the Sandhills Entities.  You and your clients have actively tried to undermine the Sandhills Entities' business, steal company assets under the cover of darkness and subterfuge, and lie to third parties about the ownership of the Sandhills Entities.

Your clients have even gone so far as **offer pilots cash bounties to steal airplanes** offering jobs to Sandhills Aviation employees to a competing business, making statements that they were going to "destroy" Sandhills Aviation's business, stealing planes and directing airport authorities that Sandhills Aviation was not authorized to fly the planes. The actions of your clients were a deliberate attempt to cause substantial harm to Sandhills Aviation, as outlined in more detail in the Sandhills Lawsuit Complaint.

Each of these actions clearly violates the requirements of Article 9.  Your repeated bad acts are clearly designed to frustrate the Purchase and Security Agreements and damage the Sandhills Entities.  Please see the attached email and know that there is more than ample evidence already that your client is acting in bad faith.

Regardless of the outcome of the case currently before the Douglas County District Court, your actions have damaged the Sandhills Entities and their business.  If this criminal behavior does not stop immediately, you and your client will be held responsible for these actions.

Neb. Rev. Stat. § UCC § 9-625, yet another Article 9 section enforced regardless of contractual terms, holds any party that breaches the non-waivable sections of Article 9 **liable for any damages caused by such breaches.**  Not only is a breaching party liable for damages caused by its actions, § 9-625 also allows a breaching party to be held liable for attorneys' fees.

May 20, 2020
Page 4 of 4

You and your clients are attempting to bypass your own pending court action and seize the assets of the Sandhills Entities via deception.

Personally, I would enjoy seeing you explain to a federal judge why sneaking onto airfields and stealing airplanes under the cover of darkness is commercially reasonable. Nonetheless, I would advise against further such illicit attempts to gain leverage and damage Sandhills' business.

Govern yourself accordingly.

Sincerely,

Robert S. Sherrets
For the Firm

cc:        Steven Sherwood
           Erik Klutman

# EXHIBIT E



July 6, 2020

Attention:                                               (Via Federal Personal Delivery and email at
Mr. Steve Sherwood                               steven.sherwood@sandhillsaviation.com)
Sandhills Aviation, LLC
6800 Whitewater Lane
Lincoln, Nebraska 68521

Mr. Steve Sherwood
Sandhills Aviation, LLC
464 E 34th St.
Wahoo, NE 68066

RE:    Notice of Termination of Air Services Agreement dated August 1, 2015

Dear Mr. Sherwood:

On May 29, 2020, Pictometry International Corp. provided written notice to Sandhills Aviation, LLC ("Sandhills") of its breaches under the parties' Air Services Agreement dated August 15, 2015, as amended (the "2015 Agreement"). Sandhills has not thereafter cured the stated breaches. Accordingly, pursuant to Section 10, this letter is to provide notice to Sandhills of the termination of the 2015 Agreement effective immediately.

Sincerely,

Jay Martin

# EXHIBIT F



May 29, 2020

Attention: Mr. Steve Sherwood            (Via Federal Express delivery and email at
Sandhills Aviation, LLC                  steven.sherwood@sandhillsaviation.com)
6800 Whitewater Lane
Lincoln, Nebraska 68521

        Re: Notice of Non-Renewal of Air Services Agreement dated August 1, 2015, as
        amended (the "2015 Agreement")

Dear Mr. Sherwood:

This notice is provided in conjunction with Pictometry International Corp's ("Pictometry") notice of breach of the 2015 Agreement also delivered this day to Sandhills Aviation, LLC ("Sandhills"), pursuant to which Pictometry intends to seek all remedies arising from the breach, including termination of the 2015 Agreement.

Without waiving Pictometry's rights and claims against Sandhills for breach of the 2015 Agreement, this letter is to provide to formal notice to Sandhills of Pictometry's decision not to renew the 2015 Agreement at the termination of the current terms, meaning September 15, 2020 for the Cessna 172 aircraft, and September 15, 2022 for the Piper Aztec and related aircraft, as more specifically identified in Amendment 3 of the 2015 Agreement. To the extent the 2015 Agreement is not earlier terminated by reason of Sandhills' breach, Pictometry provides this notice of non-renewal of the 2015 Agreement on the above stated dates.

                Sincerely,

                Jay Martin